**DEFENDERS OF WILDLIFE,**
**et al., Plaintiffs,**

v.

**Lt. General Joe N. BALLARD, Commander United States Army Corps of Engineers, Robert Walker, Acting Secretary of the United States Army, Defendants.**

No. Civ. 97–794 TUC ACM.

United States District Court,
D. Arizona.

Oct. 8, 1999.

Order Denying Reconsideration
and Granting Clarification
Nov. 10, 1999.

**1096**

John Andrew Fritschie, Wasington, DC, Eric Robert Glitzenstein, Meyer & Glitzenstein, Washington, DC, for Plaintiff.

Lois J. Schiffer, Asst. Atty. Gen., Denver, CO, for Defendants.

## ORDER

MARQUEZ, Senior District Judge.

Now fully briefed and pending before this Court are the parties' crossmotions for summary judgment which the parties agree will fully dispose of this action. Unfortunately before the Court can turn to the merits of the motions, it must once again address the scope of the action. As previously described, the Complaint is as follows:

Plaintiffs seek declaratory and injunctive relief under the Endangered Species Act (ESA), the National Environmental Policy Act (NEPA), the Clean Water Act (CWA), and the Administrative Procedures Act (APA). Plaintiffs charge that the Defendant United States Army Corps of Engineers (COE) failed to prepare environmental assessments or environmental impact statements under NEPA for numerous permits in the range of the ferruginous pygmy-owl (pygmy-owl) (Claim I), failed to consult

with the United States Fish and Wildlife Service (FWS) prior to taking actions which may affect pygmy-owls and other endangered and threatened species as required by ESA (Claim II), and acted arbitrarily and capriciously by failing to follow its own regulations and statements of policy designed to ensure compliance with the CWA, NEPA, and the ESA (Claim III).

(Order filed June 15, 1998 (June 15, 1998 Order) at 1–2.) Plaintiffs brought their claims under the citizen suit provision of the CWA, 33 U.S.C. § 1365(1)(2); the citizen suit provision of the ESA, 16 U.S.C. § 1540(g); and under the Administrative Procedures Act (APA) on the basis of 28 U.S.C. § 1331.

Early on, Defendants challenged Plaintiffs' right to proceed under the citizen suit provisions of the CWA and the ESA because of timeliness and sufficiency of Plaintiffs' notice. Defendants also argued that under the CWA, Plaintiffs could only sue the Administrator (EPA) and not the COE, hereinafter "Corps." Defendants did not contest jurisdiction under the APA. On June 15, 1998, the Court ruled on these issues. The Court held that Plaintiffs could proceed under the citizen suit provision of ESA for those claims covered by Plaintiffs' notices alleging violations made "within the context of specific development projects, such as Redhawk (a.k.a. Dove Mountain), Honeybee Canyon, Forest City, and Amphitheater High School." (June 15, 1998 Order at 9.) The Court reviewed the relevant text of the timely notices and concluded that within the general geographic confines of the notices, "the letters served to give notice to Defendants that Plaintiffs intended to sue because of Corps' management practice of issuing 404 permits under the CWA in the range of the pygmy-owl in Pima County without consulting FWS as required under the ESA." (June 15, 1998 Order at 11.) The Court explained as follows:

Plaintiffs' notice does not have to identify each and every site violation. *Hercules, Inc.*, 50 F.3d at 1247. While Plaintiffs' allegations involve activities which occurred in specific locations, Plaintiffs' primary challenge is that Defendants failed to take actions mandated by statute and regulation. When describing a failure to act it is impossible to describe the time, date, activities, and persons responsible with the same specificity used when describing an affirmative act. *Natural Resources Defense Council v. Southwest Marine*, 945 F.Supp. 1330, 1333 (S.D.Cal.1996). Investigation and resolution of Plaintiffs' allegations as presented in the site-oriented format of the three notice letters would have resolved Plaintiffs' claim. With relative ease, the Defendants can check the circumstance of other 404 permits issued in the range of the pygmy-owl in Pima County. *See Hercules*, 50 F.3d at 1248 (applying similar logic to alleged claim of a discharge violation because state and defendant had easy access to other discharge information and could easily check for other violations of same type).

(June 15, 1998 Order at 11–12.)

The Court did not reach the issue of whether Plaintiffs could proceed under the citizen suit provision of the CWA against the Corps versus the EPA because Defendants conceded that Plaintiffs could challenge any final agency action related to the CWA under the APA. (June 15, 1998 Order at 8, n. 3.)

On April 27, 1999, this Court summarized Plaintiffs' claim for the purpose of clarifying the scope of Plaintiffs' Motion for Summary Judgment as follows:

Plaintiffs' claim intertwines the CWA, the ESA, and NEPA. The CWA provides a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nations's waters." 33 U.S.C. § 2151(a). The CWA prohibits the discharge of any pollutant, including dredged or fill material, into navigable waters unless authorized by a CWA permit. 33 U.S.C. § 1311(a). The Corps regulates the discharges by permits issued under CWA section 404, 33 U.S.C.

§ 1344. The Corps issues **individual permits** on a case-by-case basis under section 404(a), 33 U.S.C. § 1344(a), or under 404(e) issues general permits, called **nationwide permits** (NWPs), on a state, regional or nationwide basis "for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, and will cause only minimal adverse effect on the environment," 33 U.S.C. § 1344(e)(1).

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). In enacting NEPA, Congress sought to assure that environmental, aesthetic, and cultural concerns are considered by federal decision-makers by requiring "the Federal Government to use all practicable means . . . to improve and coordinate Federal planning." 42 U.S.C. § 4331(b). The cornerstone of NEPA is the environmental impact statement (EIS) that an agency must prepare for all "major Federal actions significantly affecting the quality of the human environment. . . ." 42 U.S.C. § 4332(2)(C). In deciding whether to prepare an EIS, an agency may first prepare an environmental assessment (EA). An EA provides sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact (FONSI). Criteria for determining when a full EIS is required, include: "unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may adversely affect an endangered . . . species." 40 C.F.R. §§ 1508.27(b)(3), (7), (9).

The ESA provides a means to conserve the ecosystems upon which endangered species and threatened species depend and provides a program for the conservation of endangered species and threatened species. 16 U.S.C. § 1531(b). A federal agency must ensure that any action it authorizes, funds, or carries out is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species. 16 U.S.C. § 1536(a)(2). When a federal agency proposes to take an action that may affect a threatened or endangered species or its critical habitat, that agency must consult with the FWS and obtain a biological opinion from the FWS as to whether the proposed action is likely to result in a violation of the ESA. *Id.;* 50 C.F.R. § 402.

Plaintiffs' ESA claim alleges that the Corps failed to consult with FWS regarding the "likely, adverse effects" of individual and nationwide permits issued within the range of the pygmy-owl. Plaintiffs' NEPA claim is that the Corps issued individual and nationwide permits without conducting environmental analysis of the direct, indirect, and cumulative impacts of its individual and nationwide permits in the range of the pygmy-owl. Plaintiffs' claim under the APA accuses the Corps of acting arbitrarily and capriciously because it failed to comply with its own CWA regulatory provisions, such as mandatory requirements that it obtain the latest information on the pygmy-owl and the regulatory provisions requiring ESA and NEPA compliance.

(Order filed April 27, 1999 (April 27, 1999 Order) at 1–3.)

■ In spite of all this, Defendants assert in their Response/Crossmotion for Summary Judgment (Response/Crossmotion) that "Plaintiffs do not seek to have the Corp.'s decision to issue NWPs 13, 14, and 26 enjoined or declared illegal." (Response/Crossmotion at 28). Unless this Court's prior Orders are entirely off-base, however, that is precisely the focus of the Plaintiffs' Complaint. Pursuant to this

Court's June 15, 1998 Order, Plaintiffs gave Defendants sufficient notice under the citizen suit provisions of ESA to support its claim that The Corps failed to consult with FWS regarding the cumulative impact of its 404 permits before issuing the permits and authorizing the various specified projects. Furthermore, this Court believes that even if Plaintiffs lack jurisdiction to proceed under the ESA citizen suit provision, if the Court rules favorably for Plaintiffs on their NEPA and CWA claims, this action will, nevertheless, result in § 7 consultation as required under ESA. In other words, if Defendants' FONSI or "no effect" findings are arbitrary and capricious because Defendants failed to consider the cumulative impacts of its 404 permits, and if such consideration results in a finding that the NWPs "may affect" the pygmy owl and its habitat then as a matter of law, Defendants will be required to enter into section 7 consultation with FWS under ESA.

■ Plaintiffs claim that Defendants failed to utilize its authority to develop programs for conservation of the pygmy-owl is not similarly situated. Unlike the § 7(a)(2) "failure to consult" ESA violation, this charge which lies under § 7(a)(1) was not included in any Notice provided by Plaintiffs to Defendants. Unlike the § 7 duty to consult with FWS, a favorable resolution of Plaintiffs' NEPA or CWA claims will NOT result in § 7(a)(1) compliance.

With the exception of Plaintiffs' § 7(a)(1) claim, Plaintiffs may proceed with this case. The Court rejects Defendants' narrow view of Plaintiffs' Complaint and correspondingly, rejects Defendants' arguments of mootness, ripeness, and standing.

■ This case is not moot as long as Defendants continue to use the NWPs issued December, 1996. Defendants' ripeness argument fails in the face of the *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998) rationale that ripeness requires site-specific implementation because "one initial site-specific victory (if based on the

Plan's unlawfulness) could not, through preclusion principles, effectively carry the day." It is important to note, that *Ohio Forestry*, considered the ripeness issue within the context of the National Forest Management Act (NFMA), and the Court "acknowledged that a forest plan could always be challenged under the National Environmental Protection Act ("NEPA") because 'NEPA, unlike the NFMA, simply guarantees a particular procedure, not a particular result.'" *Wilderness Society v. Thomas*, 188 F.3d 1130 (9th Cir.1999). "Thus, 'a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.'" *Id.*

■ At an "irreducible constitutional minimum," a plaintiff must establish three elements to have standing. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("*Lujan II*")). First, the plaintiff must show that he has suffered "an injury in fact—a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." *Id.* Second, the plaintiff must establish "causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Id.* Lastly, "there must be redressability—a likelihood that the requested relief will redress the alleged injury." *Id.*

■ Plaintiffs sue to force the Corps to comply with various procedural and regulatory requirements. In a procedural rights case such as the one at bar, a plaintiff is not held to the normal standards for redressability and immediacy, *Lujan II*, 112 S.Ct. at 2142 n. 7; *see also Sierra Club v. Glickman*, 156 F.3d 606, 613 (5th Cir.1998) (interpreting *Lujan II* ). Of course, a procedural rights plaintiff cannot gain standing merely because of the Government's alleged failure to comply with

relevant procedural requirements. *Lujan II*, 112 S.Ct. at 2143. Instead, standing may be shown as follows:

A plaintiff must show an injury that is both concrete and particular, as opposed to an undifferentiated interest in the proper application of the law. Likewise, the plaintiff must establish that the injury is fairly traceable to the proposed government action or inaction. Finally, although a procedural rights plaintiff is not held to the normal standards for redressability, in the sense that the plaintiff need not show that the procedural remedy that he is requesting will in fact redress his injury, the plaintiff must nonetheless show that there is a possibility that the procedural remedy will redress his injury. In order to make this showing, the plaintiff must show that "the procedures in question are designed to protect some threatened concrete interest of [its] that is the ultimate basis of [its] standing."

*Sierra Club v. Glickman*, 156 F.3d at 613 (quoting *Lujan II*, 112 S.Ct. at 2143 n. 9).

■ Plaintiffs have standing. Plaintiffs reside in and use areas within pygmy-owl habitat. They allege concrete and particular injury when they assert that projects are being authorized under the NWPs issued December 1996 for activities which "may affect" the pygmy-owl because Defendants have not considered the cumulative impact of the NWPS at the regional level and have not entered into § 7 consultation with FWS. The alleged injury, the degradation of habitat affecting the pygmy-owl, is fairly traceable to the Corps' alleged failure to consider the cumulative impact of its 404 NWPs prior to their being issued December 1996, or thereafter, on a regional level prior to individual project authorizations. Procedural compliance with NEPA, CWA, and ESA will arguably redress Plaintiffs' injury.

Turning to the merits or Plaintiffs' claims, the Court notes that on April 22, 1999, the Court held a telephonic conference call to clarify the scope of Plaintiffs' Motion for Summary Judgment, specifically Plaintiffs' claims for relief. (April 27, 1999 Order at 1.) Plaintiffs voluntary limited their charges specifically to NWPs issued in the following three categories: 1) NWP 13 (bank stabilization/channelization permits), NWP 14 (road crossing permits), and NWP 26 (headwater and isolated water permits). What Defendants depict as further limitations on Plaintiffs' claims, (Response/Crossmotion at 6), are actually limitations to the relief sought by Plaintiffs, which are as follows:

1) Plaintiff seek declaratory judgment that Defendants violate NEPA, ESA and the Corp regulations by continuing to authorize NWP 13, NWP 14, and NWP 26 projects, such as those named in Plaintiffs' Amended Complaint.

2) Plaintiffs seek an injunction enjoining further authorizations for future projects under NWP 13, NWP 14, and NWP 26, within the range of the pygmy-owl, until the Corps supplements the NEPA analysis it has performed in the NWP EAs (Environmental Assessments). Specifically, Plaintiffs want the Court to order a programmatic EIS (Environmental Impact Statement) to be performed which will address impacts to the pygmy-owl in southern Arizona.

3) Plaintiffs seek declaratory judgment that Defendants improperly authorized "Red Hawk and ongoing or uncompleted channelization of the Santa Cruz River" and ask the Court to revoke the permit authorizations for those projects.

(April 27, 1999 Order at 5 (citing Plaintiffs' Motion for Summary Judgment at 38–39).) The first two are granted pursuant to this Order, the latter remains for disposition after a hearing and full briefing by the parties, with Intervenor, "Red Hawk," participating fully.

*Crossmotions for Summary Judgment*

The environmental statutes at issue here do not articulate a standard of review and so the appropriate scope of review is the standard set forth in the APA. *See Aluminum Co. Of America v. Bonneville Power*

Administration, 175 F.3d 1156, 1160 (9th Cir.1999) (APA governs judicial review of administrative decisions involving the ESA); *Idaho Farm Bureau Fed. v. Babbitt*, 58 F.3d 1392, 1401 (9th Cir.1995) (we review final rule listing endangered species in accordance with APA); *Dubois v. United States*, 102 F.3d 1273, 1284 (1st Cir. 1996) (NEPA and CWA do not articulate own standard of review; therefore, the appropriate scope of review is the APA). The APA provides that final agency action shall be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or if it was taken without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Judicial review under the APA is generally limited to the administrative record that was before the agency when the agency rendered its decision. 5 U.S.C. § 706; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *National Wildlife Federation v. Burford*, 871 F.2d 849, 855 (9th Cir.1989). Here, the parties stipulated to limit discovery to the administrative record.[1]

The inquiry is searching and careful, but ultimately the standard is a narrow one. *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. The Court is not empowered to substitute its judgment for that of the agency. *Id.* For example, the reviewing court will defer to any reasonable path that the agency follows in fulfilling its legal obligations, regardless of what the court would have done in the agency's place. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc. (NRDC)*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). The agency's action only needs to be reasonable, not the best or most reasonable. *Id.* at 855. This highly deferential standard of review, is not, however, a rubber stamp. *Citizens Awareness Network, Inc. v. United States,*

59 F.3d 284, 290 (1st Cir.1995). The relevant inquiry is whether the agency's decision was based on consideration of relevant factors and whether there has been a clear error of judgment. *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. The decision must "make sense." *Puerto Rico Sun Oil Co. v. U.S.*, 8 F.3d 73, 77 (1st Cir.1993).

Here, Plaintiffs assert that because Defendants failed to consider the cumulative impact of its NWPs 13, 14 and 26, either nationally or regionally, that its finding of no significant impact (FONSI) is arbitrary and capricious, and its decision NOT to enter into § 7 consultation with FWS regarding the environmental impact of the NWPs was clear error and not in accordance with the law as set out in the ESA, the CWA, and federal implementing regulations.

*1. Corps' decision to issue NWPs 13, 14, and 26 in violation of NEPA:*

NEPA obligates an agency to consider every significant aspect of the environmental impact of a proposed action. *Baltimore Gas*, 462 U.S. at 97, 103 S.Ct. 2246 (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). It, also, ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. *Id.* (citing *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981)).

NEPA achieves these two goals by requiring all federal agencies proposing "major Federal actions *significantly affecting the quality of the human environment*" to prepare an EIS. An EIS provides a detailed written statement that requires in-depth analysis of all potential environmental impacts. 40 C.F.R. §§ 1502, 1508.11 (emphasis added). If, however, the significance of environmental impacts is unclear,

---

1. The Court has not considered Defendants' Declaration of Robert J. Dummer nor Plaintiffs' Affidavit of R. Roy Johnson, Ph. D.

the agency may prepare an EA, "a concise public document ... that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact (FONSI)." 40 C.F.R. § 1508.9(a). In other words, the EA is a "rough-cut, low-budget [EIS] designed to show whether a full-fledged [EIS]—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary." *Cronin v. United States*, 919 F.2d 439, 443 (7th Cir.1990). If the EA results in a finding of no significant impact, the agency does not need to prepare an EIS. A FONSI, or "Finding of No Significant Impact," means that the agency has determined its action will not have a significant effect on the human environment.

■ "NEPA does not mandate particular substantive results, but instead imposes only procedural requirements." *Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517, 523 (9th Cir.1994) (citing *Vermont Yankee*, 435 U.S. at 558, 98 S.Ct. 1197); *Inland Empire Public Lands Council v. United States*, 88 F.3d 754, 757 (9th Cir.1996). The task under NEPA "is simply to ensure that [the Corps] has adequately considered and disclosed the environmental impact of its actions...." *Association of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1183 (9th Cir.1997) (citing *Baltimore Gas* 462 U.S. at 97–98, 103 S.Ct. 2246).

■ While NEPA decisions involving factual disputes, which implicate substantial agency expertise, are reviewed under the arbitrary and capricious standard, legal disputes are reviewed under the reasonableness standard. *Price Neighborhood Ass'n v. United States*, 113 F.3d 1505, 1508 (9th Cir.1997). For example, whether new information is significant enough to require a supplemental EIS is a classic example of a factual dispute which implicates substantial agency expertise and is reviewed under the arbitrary or capricious standard. *Headwaters, Inc. v.*

*Bureau of Land Management*, 914 F.2d 1174, 1177 (9th Cir.1990). On the other hand, for NEPA actions challenging the adequacy of an EIS, this circuit has fashioned a "rule of reason" to determine whether the agency has engaged in a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526 (9th Cir.1997) (internal quotations and citation omitted); *see also, Muckleshoot Indian Tribe v. United States*, 177 F.3d 800, 809 (9th Cir.1999) (the court must determine whether the EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences). This same standard is applied regardless of whether the "significance" determination is made in an EIS or EA. *See Price Neighborhood*, 113 F.3d 1505 (applying reasonableness standard to significance determination for purpose of preparing supplemental EA after initial EA finding of no significant impact). When an agency decides not to prepare an EIS, the EA must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir.1998) (citing *Save the Yaak*, 840 F.2d at 717.) "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Id.* Under the reasonableness standard, "[o]nce [we are] satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, [our] review is at an end." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992) (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)); *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir.1998).

On December 13, 1996, Defendants issued the Final Notice of Issuance, Reissuance, & Modification of Nationwide Permits, covering NWPs 13, 14, and 26. 61 FR 65874. Defendants followed all the

APA procedures for final rule making, including public comment provisions. Defendants prepared EAs for each NWP challenged here. (*See* "Final Decision Documents" at AR 9926, 9939, 10088.) These documents, in combination, explain Defendants' final decision: FONSI. Consequently, the Court looks to these documents to determine whether Defendants took a hard look at the potential environmental consequences of NWPs 13, 14, and 26, prior to issuing the permits and authorizing projects under them. These documents should contain a reasonably thorough discussion of the following relevant factors:

> *Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

> *Effects* include:
>
> (a) Direct effects, which are caused by the action and occur at the same time and place.
>
> (b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.
>
> Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

40 C.F.R. § 1508.8.

> *Significantly* as used in NEPA requires considerations of both context and intensity:
>
> (a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.
>
> (b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:
>
> * * * * * *
>
> (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
>
> (2) The degree to which the proposed action affects public health or safety.
>
> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
>
> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
>
> * * * * * *
>
> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to

anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

\* \* \* \* \* \*

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the [ESA].

\* \* \* \* \* \*

40 C.F.R. § 1508.27.

In addition to general conditions, (Final Decision, 61 FR at 659191), all NWPs include specific project limitations to ensure that adverse effects will be no more than minimal and the environment will be protected. NWPs 13, 14, and 26 are limited to the following types of projects:

*NWP 13: Bank stabilization.* Bank stabilization activities necessary for erosion prevention provided the activity meets all of the following criteria:

a. No material is placed in excess of the minimum needed for erosion protection;

b. The bank stabilization activity is less than 500 feet in length;

c. The activity will not exceed an average of one cubic yard per running foot placed along the bank below the plane of the ordinary high water mark or the high tide line;

d. No material is placed in any special aquatic site, including wetlands;

e. No material is of the type, or is placed in any location, or in any manner, so as to impair surface water flow into or out of any wetland area;

f. No material is placed in a manner that will be eroded by normal or expected high flows (properly anchored trees and treetops may be used in low energy areas); and,

g. The activity is part of a single and complete project.

Bank stabilization activities in excess of 500 feet in length or greater than an average of one cubic yard per running foot may be authorized if the permittee

notifies the District Engineer in accordance with the "Notification" general condition and the District Engineer determines the activity complies with the other terms and conditions of the NWP and the adverse environmental effects are minimal both individually and cumulatively. This NWP may not be used for the channelization of a water of the United States. (Sections 10 and 404) *NWP 14: Road Crossings.* Fills for roads crossing waters of the United States (including wetlands and other special aquatic sites) provided the activity meets all of the following criteria:

a. The width of the fill is limited to the minimum necessary for the actual crossing;

b. The fill placed in waters of the United States is limited to a filled area of no more than ⅓ acre. Furthermore, no more than a total of 200 linear feet of the fill for the roadway can occur in special aquatic sites, including wetlands;

c. The crossing is culverted, bridged or otherwise designed to prevent the restriction of, and to withstand, expected high flows and tidal flows, and to prevent the restriction of low flows and the movement of aquatic organisms;

d. The crossing, including all attendant features, both temporary and permanent, is part of a single and complete project for crossing of a water of the United States; and,

e. For fills in special aquatic sites, including wetlands, the permittee notifies the District Engineer in accordance with the "Notification" general condition. The notification must also include a delineation of affected special aquatic sites, including wetlands.

This NWP may not be combined with NWP 18 or NWP 26 for the purpose of increasing the footprint of the road crossing. Some road fills may be eligible for an exemption from the need for a Section 404 permit altogether (see 33 C.F.R. § 323.4). Also, where local circumstances indicate the need, District

Engineers will define the term "expected high flows" for the purpose of establishing applicability of this NWP. (Sections 10 and 404)

*NWP 26: Headwaters and Isolated Waters Discharges.* Discharges of dredged or fill material into headwaters and isolated waters provided that the activity meets all of the following criteria:

a. The discharge does not cause the loss of more than 3 acres of waters of the United States nor cause the loss of waters of the United States for a distance greater than 500 linear feet of the stream bed;

b. For discharges causing the loss of greater than ⅓ acre of waters of the United States, the permittee notifies the District Engineer in accordance with the "Notification" general condition;

c. For discharges causing a loss of ⅓ acre or less of waters of the United States the permittee must submit a report within 30 days of completion of the work, containing the information listed below;

d. For discharges in special aquatic sites, including wetlands, the notification must also include a delineation of affected special aquatic sites, including wetlands (Also see 33 C.F.R. § 330.1(e)); and

e. The discharge, including all attendant features, both temporary and permanent, is part of a single and complete project. *Note, this NWP will expire on February 11, 1999.*

For the purposes of this NWP, the acreage of loss of waters of the United States includes the filled area plus waters of the United States that are adversely affected by flooding, excavation or drainage as a result of the project. The 3 acre and ⅓ acre limits of NWP 26 are absolute, and cannot be increased by any mitigation plan offered by the applicant or required by the District Engineer. Whenever any other NWP is used in conjunction with this NWP, the total acreage of impacts to waters of the United States of all NWPs combined, can not exceed 3 acres.

Subdivisions; For any real estate subdivision created or subdivided after October 5, 1984, a notification pursuant to subsection (b) of this NWP is required for any discharge which would cause the aggregate total loss of waters of the United States for the entire subdivision to exceed ⅓ acre. Any discharge in any real estate subdivision which would cause the aggregate total loss of waters of the United States in the subdivision to exceed 3 acres is not authorized by this NWP; unless the District Engineer exempts a particular subdivision or parcel by making a written determination that: (1) The individual and cumulative adverse environmental effects would be minimal and the property owner had, after October 5, 1984, but prior to February 11, 1997, committed substantial resources in reliance on NWP 26 with regard to a subdivision, in circumstances where it would be inequitable to frustrate the property owner's investment-backed expectations, or (2) that the individual and cumulative adverse environmental effects would be minimal, high quality wetlands would not be adversely affected, and there would be an overall benefit to the aquatic environment. Once the exemption is established for a subdivision, subsequent lot development by individual property owners may proceed using NWP 26. For purposes of NWP 26, the term "real estate subdivision" shall be interpreted to include circumstances where a landowner or developer divides a tract of land into smaller parcels for the purpose of selling, conveying, transferring, leasing, or developing said parcels. This would include the entire area of a residential, commercial or other real estate subdivision, including all parcels and parts thereof.

Report: For discharges causing the loss of ⅓ acre or less of waters of the United States the permittee must submit a report within 30 days of completion of the work, containing the following information:

(a) Name, address, and telephone number of the permittee;

(b) Location of the work;

(c) Description of the work; and,

(d) Type and acreage (or square feet) of the loss of waters of the United States (e.g., 1/10 acre of marsh and 50 Square feet of a stream.) (Section 404)

61 FR at 65914–5, 65916.

### a. Environmental Assessments (Eas) for NWP 13, 14 and 26

The EAs for each of these NWPs include individual and cumulative impact analyses. The EAs are nearly identical in how they assess the impact of the respective projects: bank stabilization, road crossings, and headwaters and isolated waters discharges. For example, all three EAs tell us that "Because NWPs authorize activities on a nationwide basis, it is difficult to predict all of the indirect impacts that may be associated with each individual action." (EA 13: AR at 009928; EA 14: AR at 009941; EA 26: AR at 010091). In all the EAs, the explanation continues as follows:

> For example, the NWP for a road crossing may be used to fulfill a variety of project purposes. Indication that a factor is not relevant to a particular NWP does not necessarily mean that the NWP would not have an effect on such factor(s), but that it is a factor not readily identified with the authorized activity. In any case, adverse affects will be controlled by the terms, conditions and additional provisions of the NWP. For example, Section 7 consultation will be required for activities that may adversely affect endangered species. In other cases, factors may be relevant, but have negligible impacts. For example, the impacts of a boat ramp on flood plain values, water level fluctuations or flood hazards.

(NWP 13: AR at 009928; NWP 14: AR at 009941; NWP 26: 010091.)

The EAs explain, "Cumulative impacts of the NWP generally do not depend on the number of times the permits are used on a national basis but on the number of times this NWP and other permits are used within a geographic area." (NWP 13: AR at 009933; NWP 14: AR at 009946; NWP 26: AR at 010097.) The EAs, therefore, provide that cumulative impacts be assessed at the regional level as follows:

> Within a geographic area (e.g., a specific watershed) it may be determined that the cumulative effects of NWPs have more than minimal adverse effects. The division engineer and the district engineer will monitor and review geographic areas that may have cumulative impacts that are more than minimal. The division engineer and the district engineer have the authority to require individual review of projects or to require special conditions to the permit either on a case-by-case basis or on a regional basis where cumulative impacts are determined to be more than minimal. When a division engineer or district engineer determines that a geographic area may have cumulative impacts that are more than minimal they will use the revocation and modification procedure at 33 C.F.R. § 330.5. *In reaching the final decision they will compile information on the cumulative adverse effects and supplement this document.*

(NWP 13: AR at 009933; NWP 14: AR at 009946; NWP 26: AR at 010097 (emphasis added).)

The EAs include NWP notification provisions which require Pre-construction notification (PCN) to other agencies; the district engineer must specifically request any information that FWS or National Marine Fishery Service (NMFS) may have on endangered species as part of the PCN consultation. (NWP 13: AR at 009935; NWP 14: AR at 009948–49; NWP 26: AR at 010099–100.) The Corps made the same finding for each NWP: "Based on the above the Corps has determined that this NWP will have no affect on threatened or endangered species or their critical habitat." (NWP 13: AR at 009935; NWP 14: AR at 009949; NWP 26: AR at 0100100.)

Even though the Corps believed that its procedures ensured ESA compliance, in

order "to provide further assurances," the EA included additional measures, as follows:

First, although not required to, the Corps will request programmatic formal Section 7 consultation with the FWS and NMFS as a precaution to further ensure that there is no effect. *We intend that formal consultation will be concluded as soon as possible but not to exceed two years from the date of issuing the revised and reissued NWPs.* Second, the Corps will direct the district offices, in writing, to meet with appropriate local representatives of the FWS and NMFS and establish or modify existing procedures to ensure that the Corps has the latest information regarding the existence and location of any threatened or endangered species or their districts have the best information available to make decisions regarding whether a specific activity may affect an endangered species and thus whether or not to initiate consultation.

(NWP 13: AR at 009936; NWP 14: AR at 009949; NWP 26: AR at 0100100) (emphasis added).

The EA for NWP 26, specifically provides for a regional modification alternative, as follows:

Corps divisions and districts will monitor and analyze the impacts of the nationwide permits and if warranted, regionally condition this nationwide permit to ensure that no more than minimal adverse environmental effects result. In some cases districts will revoke the use of the nationwide permit based upon the potential for unacceptable adverse environmental effects (e.g., high value or unique wetlands) to occur even though the terms and conditions of the permit may be met.

(NWP 26: AR at 010095.)

*b. Final Notice of Issuance, Reissuance & Modification of Nationwide Permits*

The Final Decision, issued December 13, 1996, 61 FR 65874, incorporated the im-

pact assessments contained in the EAs and more fully explained the measures the Corps considered necessary to ensure that adverse effects will be no more than minimal and that the environment will be protected. 61 FR at 65974. After reviewing 4,000 public comment documents addressing the proposed NWPs, the Corps reissued the permits with modifications. The Corps prepared the following summary of its review and final decision, which in pertinent part is as follows:

An effective NWP program is essential to administration of the Corps regulatory program. The Corps, however, is increasingly aware of the concerns regarding the level of adverse effects being authorized by NWPs, particularly NWP 26. As a result, we have taken a critical look at the NWP program to better ensure that projects that truly have minimal impacts will continue to be authorized, while ensuring that only minimal individual and cumulative adverse effects will result from the Corps authorizing projects under the program. For example, we have made substantial changes to NWP 26, with an ultimate approach of more clearly defining the activities regulated through activity-specific replacement general permits. The interim changes to NWP 26 we have made will greatly increase environmental protection while increasing the review time for a relatively small percentage of the total number of activities authorized each year. We have also become increasingly aware of the concerns that NWPs, particularly NWP 26, need to be modified to reflect regional differences in aquatic ecosystem functions and values and to more effectively reflect the desire of the states to develop partnerships to protect the aquatic environment. We, therefore, have directed our districts to carefully review all of the NWPs, particularly NWP 26, to revoke applicable NWPs in high value aquatic ecosystems, and to add regional conditions to limit the applicability of the

NWPs to ensure that no more than minimal adverse effects occur in each district. . . . We are directing our districts to develop local procedures with their counterparts in the U.S. Fish and Wildlife Service and National Marine Fisheries Service which will ensure that the Corps bases its "affect" and "jeopardy" decisions on the best available information. We are also initiating formal programmatic consultation under section 7 of the Endangered Species Act regarding the procedures associated with administering the NWP program. We believe that the changes described above, along with many others we have included in this reissuance of the NWPs, will substantially increase protection of the aquatic environment, ensure that no more than minimal adverse effects will occur, and maintain the regulatory flexibility necessary to administer a reasonable regulatory program.

61 FR at 65874.

The majority of NWPs had first been issued in 1991, effective January 21, 1991 to expire January 21, 1997. The 1996 Final Decision reissued the NWPs for another five-year period, with the exception of NWP 26, which was to expire in two years unless "otherwise modified or revoked." 61 FR at 65875. In the original NWPs, District Engineers (DE) held discretionary authority to institute regional conditions or special conditions on a case-by-case basis to ensure that project authorizations would have minimal adverse effects. This discretionary authority continued as a major component of the program in 1996. In 1991, however, the impact analysis was conducted nationwide. (*See e.g.* AR at 09497: EA for NWP 13, dated November 19, 1991, section 4(d)(iv).) The 1996 regional focus for the impact analysis was a clear modification and entirely new approach for the 1996 NWPs. The Final Decision, Regionalization of NWPs, is as follows:

The Corps proposed a process to regionalize the nationwide permits, particularly NWP 26, in order to reflect the differences in aquatic ecosystem functions and values that exist across the country. We envisioned a process where we would solicit the views of the various stakeholders regarding the nationwide permits and develop region-specific approaches for each district to best protect the environment while providing fair, reasonable, and timely decisions for the regulated public. The final permits we are issuing today reflect a clear decision to proceed in a way that does regionalize the program, particularly NWP 26. We are issuing NWP 26 for an interim period of two years, during which we will gather interested parties at the national level as well as the district and division levels, to develop replacement permits for NWP 26. The replacement permits will be activity-specific rather than the geographic based approach of NWP 26. By developing activity-specific NWPs to replace the existing NWP 26, we will be able to more clearly and effectively address the potential impacts to the aquatic environment, as well as more effectively address specific applicant group needs.

Once the Corps establishes activity-specific replacement permits that have clear national conditions to ensure the aquatic environment is protected and the impacts will be no more than minimal, each district, working with the Corps divisions, will establish regional conditions for the activity specific replacement permits. This may result in the revocation of certain NWPs in aquatic environments of particularly high value, and the addition of regional limitations to specifically address needs for protection of specific environmental assets. . . .

\*　　\*　　\*　　\*　　\*　　\*

During the next two years, as the Corps develops the activity-specific replacement permits, the revised NWP 26 will be in effect. We have substantially changed NWP 26, with additional nationwide limitations and conditions, in order to provide substantially improved protection of the aquatic environment,

and to ensure that only minimal adverse effects will result from use of the NWP. These additional limitations and conditions are discussed in detail in the preamble for NWP 26 below, as are the specific means by which we have directed the districts and divisions to regionalize NWP 26. In summary, we have directed our districts working with the divisions and Federal and state natural resource agencies to add region-specific conditions to all NWPs, paying particular attention to NWP 26, which will add an additional layer of protection to the changes we have put into place at the national level. *This process will also involve public notice and comment to ensure that all interested parties have the opportunity to be involved in the process.*

61 FR at 65875–86.

In its Final Decision, the Corps responded to public concern that under NEPA an EIS was required to ensure that adverse effects are minimal, especially for NWPs *26,* and NWPs 12, *13, 14,* 34, and 40. 61 FR at 65878–79. The Corps qualified its determination that NWPs are "minimal and not significant," as follows:

The Corps evaluation of the impacts on the aquatic environment resulting from the Nationwide Permit (NWP) program indicates that the cumulative adverse environmental effects are minimal and not significant. This is based on our belief that cumulative impacts must be viewed in the context of the individual watersheds. We believe that past regional conditions placed on NWPs, particularly NWP 26, in many districts have substantially reduced cumulative impacts on a watershed basis. Districts have revoked NWP 26 in many high value watersheds and placed additional notification or other limitations on NWP 26 to ensure minimal adverse environmental effects to specific watersheds. Although these past regional protections have substantially reduced adverse environmental impacts, *we believe additional protections are needed to continue to ensure that only minimal adverse*

*environmental effect will occur.* Some of the additional protections we are implementing include substantially reducing the acreage limits under NWP 26, ensuring that stacking of NWPs impacts a maximum of 3 acres and only after a review by the Corps, substantially increasing the number of instances where a Corps review is necessary, and requiring increased and more detailed data collection to better monitor NWP activity. Moreover, we are more strongly directing the Corps districts and divisions to add regional conditions for high value watersheds, and additional generalized regional conditions that will ensure that only minimal impacts will occur. This will also ensure that cumulative impacts will not be significant.

61 FR at 65878–79.

Furthermore, the Corps explained that it was not appropriate to define "minimal" at the national level for purposes of the 404 program limitation that activities authorized under NWPs be "similar in nature" and "have no more than minimal adverse effects on aquatic resources such as wetlands," 61 FR at 65879, but that it "must be defined based on the effects of the specific project in the immediate vicinity, and in the watershed where the activity will occur." *id.* The Final Decision in pertinent part is as follows:

We have determined that it is not appropriate to define the term "minimal" at the national level, because what constitutes minimal adverse environmental effects can vary significantly from resource to resource, state to state, county to county, and watershed to watershed, as well as district to district. Moreover, the term "minimal" must be defined based on the effects of the specific project in the immediate vicinity, and in the watershed where the activity will occur. Simply listing the acres lost nationally is not instructive regarding minimal adverse effects. Therefore, the determination of "minimal" adverse environmental effects is left to the discretion of the DE.

The district represents the most knowledgeable office concerning the aquatic resources within that particular region, and the DE is therefore the most capable of assessing relative impacts that would result from activities authorized under the NWP program.... The Corps divisions have had the authority, based on recommendations from the Corps districts, to reduce potential adverse effects by imposing regional conditions or revoking the applicability of specific NWPs in high value aquatic areas. The Corps divisions have used this authority in many cases. However, we are, in this notice, further emphasizing to all Corps districts and divisions that they should use this authority within their geographical areas to further ensure that only minimal individual and cumulative adverse effects will occur. We expect that each division will, based on the recommendations from each district, restrict the use of several nationwide permits to ensure protection of high value aquatic systems under its authority....

61 FR at 65879–80.

As it did in the EAs, the Final Decision included the following "disclaimer":

Although the Corps continues to believe that these existing procedures ensure that the Nationwide Permit Program complies with the ESA, we will take the following additional steps to provide further assurance. First, although not required, the Corps will initiate programmatic formal section 7 consultation with the FWS and NMFS as a precaution to further ensure that there is no adverse effect on listed species. We intend that formal consultation will be concluded as soon as possible but not to exceed two years from the date of issuing the revised and reissued NWPs....

\* \* \* \* \* \*

While we are issuing/reissuing this entire package of NWPs (except for NWP 26) for a period of five years, we will be working over the next twenty-four months to collect data, monitor use of these NWPs, and conduct formal consultation under section 7 of the ESA. This two year process is intended to provide us with more detailed information on the types of activities being authorized, the nature and extent of wetlands and other waters being affected by the NWPs, and potential effects to the Nation's Federally listed threatened and endangered species. Immediately following the conclusion of this two year process, we will use the results of this data collection, analysis, and consultation to reevaluate the NWPs being issued/reissued today to determine what modifications are necessary. We will provide to the public, by notice in the Federal Register, the results of our data collection and consultation. In addition, we will provide the opportunity for public comment on changes to the NWP program that might be necessary to ensure compliance with the CWA, ESA and NEPA....

61 FR at 65880–81.

Importantly, the Final Decision conditioned the Nationwide Permits as follows:

Regional Conditioning of Nationwide Permits: Concurrent with this Federal Register notice, District Engineers are issuing local public notices. In addition to the changes to some NWPs and NWP conditions required by the Chief of Engineers, the Division and District Engineers may propose regional conditions or propose revocation of NWP authorization for all, some, or portions of the NWPs. Regional conditions may also be required by state Section 401 water quality certification or for state coastal zone consistency. District engineers will announce regional conditions or revocations by issuing local public notices. Information on regional conditions and revocation can be obtained from the appropriate District Engineer, as indicated below....

61 FR at 65911.

c. *Final Decision: NWP 13, 14, and 26*

The Final Decision addressed public comments aimed specifically at the various

NWPs, including NWP 13, 14, and 26. In response to public comments that NWP 13 should be used selectively on a regional or watershed basis to prevent cumulative adverse effects in sensitive habitat, the Corps explained that regional conditions and discretionary authority of the DE to require case-by-case conditions will ensure that greater than minimal adverse effects do not occur. 61 FR at 65885.

The public comments addressing NWP 26 were extensive, and in large part opposed NWP 26: "expressing concern that NWP 26 authorizes activities that are not similar in nature and activities that have greater than minimal impacts both individually and cumulatively, concluding that NWP 26, in many cases, is therefore, 'illegal'." 61 FR at 65890. The Corps' response was in pertinent part as follows:

> The Corps agrees that the level of cumulative adverse effects under NWP 26 must be reduced and more effectively mitigated....
>
> \* \* \* \* \* \*
>
> In light of our internal evaluation of NWP 26, and a careful consideration of all comments regarding its reissuance, we have determined that a modified approach to NWP 26 and eventual replacement of NWP 26 is necessary in order to ensure that in the future no more than minimal adverse effects occur to the waters of the United States, both individually and cumulatively. This determination is supported fully by the majority of comments from the public and other Federal and state resource agencies. Therefore, NWP 26 will be immediately modified and eventually replaced with a new approach to authorizing activities with minimal adverse effects. This new approach will take into account the Corps workload and a desire to reduce unnecessary regulatory burdens.
>
> The approach that we are implementing today will ensure that only activities resulting in minimal adverse effects go forward under NWP 26, while maintaining flexibility and expedited permitting for applicants proposing such projects.
>
> Based on the desire to develop a more specific data base on the specific types of activities authorized under NWP 26 and an improved data base on impacts of projects authorized under NWP 26, we have determined that a phased approach to NWP 26 is necessary. In this regard, we are, with this notice, issuing a modified NWP 26 for a period of two years rather than the normal 5 year period for all other nationwide permits. During this two year period, which starts with today's date, the Corps will collect additional data on the types of activities regulated and develop, propose, and issue new nationwide permits to replace the revised NWP 26. Although we recognize the ecological importance of isolated and headwater wetlands and the potential for impacts to these resources by NWP 26, we believe it is necessary to reissue NWP 26, in its more restrictive and environmentally sensitive form, during the two year phase out period to ensure fairness to the regulated public and to allow for development of activity specific replacement NWPs. The replacement permits, which will be activity specific, will be published for public review and comment approximately 18 months from today (approximately May 1998)....

61 FR at 65890–91.

During the two year period required to issue activity-specific permits to replace NWP 26, the Corps believed certain modifications to NWP 26 were necessary. Defendants changed the threshold limits to ⅓ and 3 acres, 61 FR at 65891. Using these thresholds, the maximum fill allowable under NWP 26 became 3 acres. *Id.* NWP 26 would require a PCN for discharges over ⅓ acre, with Corp-only PCNs for fills between ⅓ and 1 acre, and for fills over 1 acre, Federal resource agencies would be provided a copy of the PCN and given an opportunity to comment. *Id.* Further provisions allowed the DEs to revoke NWP 26 for specific geographical areas. 61 FR at 65891. DEs could also exercise discretion-

ary authority and require an IP on a case-by-case basis when they determine that "minimal adverse effects levels" will be exceeded. 61 FR at 65892. DEs also had the authority to reduce impacts by requiring mitigation for most projects from ⅓ to 3 acres through the PCN process.[2] *Id.* Last, the Corps included the following:

> To further ensure that geographical areas or waters do not receive greater than minimal adverse effects through the excessive use of NWP 26, *we are with this notice directing district and Division Engineers to carefully review areas under their authority with a view toward additional regional limitations to NWP 26,* 61 FR at 65981. *We believe that every district has high value aquatic areas where NWP 26 must be further limited or revoked.*

61 FR at 65890–91.

The Final Decision explained this directive as follows:

> The Corps believes there are benefits to be gained through regional conditioning of NWP 26, both for natural resource protection and for the regulated public. Guidance being provided to the districts and divisions will require that the districts provide opportunity for full public review and comment in the process for establishing regional conditions, and will require that they consider modifications of the acreage limits and limitations of use, based on types of aquatic resources and activities.... Further definition of the permit, through regional conditions, will provide the regulated public with increased certainty and predictability while at the same time further ensuring against use of the permit under circumstances that may cause greater than minimal adverse effects. *The fact that districts and divisions do regionalize NWP 26 through regional conditions to protect certain aquatic systems is one of the reasons that the Corps has deter-*

> *mined that only minimal adverse effects occur nationwide.*

61 FR at 65892.

In response to criticism that the Corps should have prepared an EIS before issuing the NWP 26, the Corps explained, in pertinent part, as follows:

> The Corps believes that the modified NWP 26 structure, along with regional conditions and case specific discretionary authority, will ensure that adverse effects are no more than minimal on a watershed basis. We believe that it is inappropriate to simply sum the total acres of impact nationwide and assume significant impacts. We believe that environmental effects must be viewed on a watershed basis. With the substantial level of mitigation required by the Corps for impacts to the higher value wetlands, we believe that the environmental effects are not significant.

61 FR at 65893.

### Conclusion

 The Corps' FONSI was conditioned on the modified NWP structure, which provided that the impact analysis be conducted at the regional level. This never happened. The Corps went back to business as usual, meaning case-by-case assessments with discretionary authority to implement special conditions or require an individual permit (IP) when necessary. NWP 26, set to expire in two years, instead of the usual five years, is still in effect today.

The administrative record, documenting the Corps analysis and determinations, prepared to comply with NEPA and the Clean Water Act, includes "an environmental assessment and, where relevant, a section 404(b)(1) Guidelines compliance analysis." 61 FR at 65879. The Corps explained that "[a]dditionally, Division Engineers will supplement the national NWP

---

**2.** In most cases, mitigation for impacts below 1 acre will be most beneficial through mitigation banks and "in lieu fee" programs. In lieu fee programs allow permittees to obtain

mitigation through funds paid to groups who will use these funds to restore, create, enhance, and preserve wetlands.

decision documentation to discuss regional conditions and regional revocation requirements, which further ensure that the impacts are minimal." *Id.* "These supplements will be available for inspection at the appropriate district offices." *Id.* Of course regional supplements don't exist for this region, but nevertheless, the administrative record is extensive and very clearly documents the Corps' decision to issue NWPs 13, 14, and 26. It is here, in the EAs and Final Decision, that Defendants' defense must be found. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214 (9th Cir.1998). The Court rejects the declaration of Project Manager Dummer in its entirety. *Overton Park,* 401 U.S. at 419, 91 S.Ct. 814 (litigation affidavits which are merely post-hoc rationalizations are inadequate).

This region's DE never discussed regional conditions or regional revocation requirements as anticipated in the Final Decision. (*See* Final Decision at 61 FR at 65890–91 ("We believe that every district has high value aquatic areas where NWP 26 must be further limited or revoked.")). Instead, Defendants rely on the site-specific PCN documents in the administrative record. These documents reveal that the sole consideration made by the Corps prior to NWP authorization was whether there were any pygmy-owls or occupied habitat present within the "permit area," or the larger, "overall project" area. (*See e.g.* Baughn residence, NWP 14:. Road crossing project (AR at 8514–8542) (Defendants instructed permittee to conduct bird survey to determine "presence/absence" of pygmy-owls, in response to neighbors' reported sighting of a pygmy-owl which had nested on site for past three years, and letter from FWS that project was within habitat considered suitable for pygmy-owl and that the project should not go forward until it could be determined that there would be no adverse affect to the pygmy-owl); Red Hawk golf course (now known as Dove Mountain), NWP 26: Headwaters and isolated waters discharges project (AR at 542–549) (FWS requested § 7 consultation for Red Hawk golf course because although no pygmy-owls detected by bird surveys, the project area consists of habitat potentially suitable for the pygmy-owl; Defendants responded that they would contact FWS for consultation if pygmy-owl was discovered on-site or critical habitat was designated; in light of Defendants stance and because substantial habitat had already been cleared, FWS asked the permittee to conduct additional bird surveys encompassing a one-half mile strip of government lands immediately adjacent to the Red Hawk development so that if pygmy-owls were found, FWS could again request § 7 consultation.).

While Defendants' scope of analysis may be appropriate for a site-specific NWP authorization, it is inadequate to measure the impact of implementing the NWP program under which thousands of projects will be authorized. The kind of impact statement required depends upon the kind of federal action being taken. *Kleppe v. Sierra Club,* 427 U.S. 390, 402 n. 14, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (citing *Aberdeen & Rockfish R. Co. v. SCRAP,* 422 U.S. 289, 322, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975)). As the Court in *Kleppe* explained, the statement on a proposed mining plan or a lease application may bear little resemblance to the statement on the national coal-leasing program. *Id.* The 1996 Final Decision recognized the Corps' duty to assess the cumulative impact of its NWP program and determined that the assessment would best be done at the regional level. Here, Defendants, themselves, have defined the bounds of the analysis to be regionally based, watershed by watershed. *See e.g.: Blue Mountains Biodiversity Project,* 161 F.3d at 1216; (Forest Service required to analyze combined effects of several ongoing and proposed timber sales in the same watershed which were reasonably foreseeable); *Carmel–By–The–Sea v. United States Department of Transportation,* 123 F.3d 1142, 1160 (9th Cir.1997) (EIS failed to assess cumulative impact where it identified future planned projects, but did not discuss how the projects together would affect the wetlands); *Re-*

*sources Ltd., Inc. v. Robertson,* 35 F.3d 1300, 1305-06 (9th Cir.1993)(USFS must consider federal and non-federal actions' cumulative impacts in EIS); *Inland Empire,* 992 F.2d at 981 (if cumulative effects would result in substantial environmental impacts agency cannot consider project in isolation); *Muckleshoot Indian Tribe v. United States,* 177 F.3d at 811–12 (Forest Service didn't take hard look where it failed to consider planned land sale); *Cuddy Mountain,* 137 F.3d at 1378–1379 (where several actions, specifically other timber sales, have a cumulative environmental effect consequence must be considered in EIS).

Contrary to the Final Decision, Defendants now argue that "No Regional Programmatic Analysis of the cumulative impacts of NWPs on the pygmy-owl in Southern Arizona is required," (Crossmotion at 43), which is directly contrary to their conclusions presented in the Final Decision. In light of its Final Decision, Defendants cannot rely on the line of cases which hold that because the law does not require the impractical nor the impossible. *See Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754 (9th Cir.1996) (to analyze separately each species to determine the area covered by its particular ecosystem and then analyze its population viability in that area could become particularly burdensome if there are a number of different species to examine, each with a different population ecosystem to analyze); *Northwest Resource Information Center v. National Marine Fisheries Service,* 56 F.3d 1060 (9th Cir.1995) (cannot force an agency to aggregate diverse actions to the point where problems must be tackled from every angle at once).

■■■ At a minimum, this Court must order the Defendants to take a "hard look" at the cumulative impact of the NWP program, specifically NWPs 13, 14, and 26, and determine that the use of these permits in this region has no significant impact. "NEPA requires consideration of the potential impact of an action before the action takes place." *Cuddy,* 137 F.3d at 1380 (citing *City of Tenakee Springs,* 915 F.2d at 1313). It was not appropriate to defer the cumulative impact assessment to a future date. *Id.* Defendants were fully aware of NEPA's obligations, as evidenced by their Final Decision, yet they have done nothing since 1996 to comply with the law. This Court cannot condone further violation of NEPA which would result if it allows Defendants to continue authorizing projects with NWPs 13, 14, and 26, when the proper impact analysis has not been performed. As a matter of law, authorizations under the challenged NWPs violate NEPA mandates until Defendants conduct a regionally based, programmatic impact analysis.

The Court does not need to reach the merits of Plaintiffs' ESA claim because on July 12, 1999, FWS designated critical habitat for the pygmy-owl.[3] Defendants have been in "voluntary" consultation with FWS since then regarding "what types of authorizations may effect the pygmy-owl." (Defendants' Reply at 7.) An agency initiates consultation when it proposes to take an action that "may affect" a threatened or endangered species or its critical habitat.

The Court notes that FWS and the Corps have treated the significance of critical habitat designation for the pygmy-owl differently. FWS believes that habitat designation is not necessary to trigger the

**3.** Designation of critical habitat was a long time in coming. December 12, 1994, FWS proposed listing the pygmy-owl as endangered and designating riparian critical habitat in Arizona. Congress imposed a moratorium on spending funds for final determination to list species or designate critical habitat. January 10, 1997, FWS issued the Final Rule listing the pygmy-owl as endangered, but did not designate critical habitat. *Southwest Center for Biological Diversity v. Babbitt,* CIV 97–704 TUC ACM, resulted in a judicial decision that FWS had acted arbitrarily and capriciously. December 30, 1998: Proposed Rule designating critical habitat, including northwest Tucson. July 12, 1999: Final Rule designating critical habitat, including northwest Tucson.

§ 7 consultation requirements of ESA, but that consultation is necessary for any action that is likely to jeopardize the continued existence of any listed species, including destruction of habitat that reduces the likelihood of both survival and recovery of a species. *See Southwest Center for Biological Diversity v. Babbitt,* CIV 97–704 TUC ACM, (Order filed October 9, 1998 at 15, n. 6.) Defendants, on the other hand, consistently limited review to whether there were any pygmy-owls present at the project site or in the project area. The designation of habitat moots the issue of which ESA interpretation is correct. All parties now agree § 7 consultation is appropriate. It shall be so ordered.

Accordingly,

**IT IS ORDERED** that the Parties' request to Secure Time for Hearing is DENIED; the Court finds that the record is complete and shall rule based on the parties' briefs.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment is GRANTED; Defendants' Crossmotion for Summary Judgment is DENIED.

**IT IS FURTHER ORDERED** that Defendants' are enjoined from any further authorization under NWPs 13, 14, and 26, until Defendants conduct a regionally based, programmatic impact analysis.

**IT IS FURTHER ORDERED** that Defendants shall engage in § 7 consultation with FWS regarding the effect of its NWP program on the pygmy-owl and its habitat in this region.

**IT IS FURTHER ORDERED** that a hearing shall be held on Monday, January 10, 2000 at 1:30 p.m., regarding appropriate relief in respect to the existing Red Hawk NWP 26 authorization. Plaintiffs shall file the moving brief within 30 days of the date of this Order; Defendants and Intervenor Red Hawk shall simultaneously file Responses within 30 days of being served with Plaintiffs' Motion; Plaintiffs shall have 15 days to file a Reply.

## ORDER

On October 8, 1999, this Court filed its ruling regarding the effects of NWPs 13, 14, and 26 on the pygmy-owl. On October 25, 1999, the Government filed a Motion to Reconsider or, in the Alternative, Motion for Clarification. A motion for reconsideration should not be used to ask a court "to rethink what the court had already thought through—rightly or wrongly." *Defenders of Wildlife v. Browner,* 909 F.Supp. 1342, 1351 (Ariz. 1995 (citing *Above the Belt, Inc. v. Mel Bohannon Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983).) Arguments that a court was in error on the issues it considered should be directed to the court of appeals. *Refrigeration Sales Co. v. Mitchell–Jackson, Inc.,* 605 F.Supp. 6, 7 (N.D.Ill.1983). The Motion to Reconsider is denied, and the Motion to Clarify is granted.

According to the Corps., the cumulative impact of the NWPs cannot accurately be determined at a nationwide level because impact depends on the "number of times the permits are used within a geographic area." (Order at 16 (citing NWP 13: AR at 009933; NWP 14: AR at 009946; NWP 26: AR at 010091).) The Court in its Order set out the portions of the Final Rule which support its conclusion that the Final Rule did not include any meaningful cumulative impact assessment because the relevant inquiry should be made at "some" regional level. The Court held that the record fails to show that the Corps. performed such an assessment sufficient to cover the cumulative effects of NWPs 13, 14, and 26 on the pygmy-owl. The administrative record is unequivocally clear that the Corps.' impact analysis was conducted on a case-by-case basis and limited to determining whether or not there were pygmy-owls inhabiting a project site.

Requiring the cumulative impact assessment to be conducted at some meaningful level is consistent with *Kleppe v. Sierra Club,* 427 U.S. 390, 414, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1975), wherein the Secretary of Interior had determined that the appro-

priate scope for assessing impact be based on basins, drainage areas, and other factors. The Court, in *Kleppe,* held this scope was not arbitrary nor capricious, and that "determination of the extent and effect of these factors [cumulative environmental impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies." *Id.* Here, that agency is the Corps. This Court's order is not in conflict with *Kleppe.* The Court has not ordered Defendants to conduct an EIS at the regional level, but only requires a meaningful "hard look" at the environmental impacts (direct, indirect and cumulative) of the challenged NWPs to be made in some NEPA document. The injunction issued here is in effect until the Defendants take a " 'hard look' at the cumulative impact of the challenged NWPs and determine that the use of these permits in this region has [or does not have a] [ ][s]ignificant impact." (Motion to Reconsider at 27 (citing Order at 27).) It is up to the Corps. to decide whether to use an EA or EIS.[1]

The geographic scope for this analysis should in the first instance be determined by Defendants. The Court finds nothing arbitrary or capricious on the face of the Corps.' proposed scope for its cumulative impact assessment for the pygmy-owl, which is as follows: 1) within the range of the pygmy-owl; 2) in Pima and Pinal Counties—exclusive of tribal lands.[2] The "range" of the pygmy-owl shall be defined as FWS's recent designation of critical habitat for the pygmy-owl (those areas that FWS believes are essential to the conservation of the pygmy-owl and in need of special management or protection). In addition to designated critical habitat, range shall include areas outside designated critical habitat in Pima and Pinal Coun-

ties that nonetheless may contain occupied or suitable habitat for the pygmy-owl. The parties agree that the injunction should cover the above areas below 4000 feet in elevation in Pima and Pinal counties. Plaintiffs agree to exclude the urban areas of Phoenix and Tucson, with the urban area of Phoenix defined as being "within the boundaries of Bell Road on the north, Pima Road on the east, Southern Avenue on the south, and Highway 303 on the west" and the urban area of Tucson defined as being "south of River Road, west of Harrison Road, north of Irvington Road, and east of Interstate 10." Plaintiffs also agree to the exclusion of tribal lands from the scope of the injunction.

Plaintiffs do object to Defendants' suggestion to further limit the term "range" of the pygmy-owl for certain habitat characteristics identified in questions 2a and 2b of a 1998 FWS guideline. Plaintiffs complain that such a limitation would not be consistent with the common interpretation of the term "range" and "ignores all environmental values other than suitability for current pygmy-owl usage, ignores the potential for habitat to regenerate on the site, ignores the indirect effects on habitat downstream through changes in hydrology, and, most importantly, does not produce a clear and discretely defined boundary (geographic and elevational) within which the injunction applies to provide certainty to the entire public." (Response at 19.) The Court finds that further delineating the scope of the injunction to coincide with the 1998 FWS guideline is not warranted at this time.

It is the Court's intention that the Corps., in the first instance, fashion the measures necessary to implement the injunction. The Corps. may issue individual permits and may prioritize issuance of IPs

1. Under NEPA, if substantial questions are raised as to whether NWPS 13, 14, and 26 *may* cause *significant* environmental impacts on the pygmy-owl, including degradation of habitat. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1216 (9th Cir. 1998).

2. Tribal lands are not excluded from the scope of the Court mandated cumulative analysis of environmental impacts of the challenged NWPs.

for projects that are critical for protection of the environment or public safety—or seek modification of the injunction for specific, individual projects which the Corps. believes are vital for the public health and safety. The Court finds that these alternative avenues will serve the most critical needs of the public during the injunction. The duration of the injunction is largely in the hands of the Corps.

 The Corps. challenges this Court's authority to grant relief which includes an order that Defendants enter into § 7 consultation with FWS. Defendants assert that the issue is moot because it has begun such consultation and, therefore, "there is no basis for the Court to order it to do so." (Motion to Reconsider at 22.) Defendants carry a heavy burden to establish mootness and must do more than voluntarily cease alleged illegal conduct. As the Ninth Circuit recently explained:

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). "Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant ... free to return to his old ways." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). Nevertheless, part or all of a case may become moot if (1) "subsequent events [have] made it absolutely clear that the allegedly wrongful behavior [cannot] reasonably be expected to recur," *Concentrated Phosphate*, 393 U.S. at 203, and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Lindquist v. Idaho State Bd. of Corrections*, 776 F.2d 851, 854 (9th Cir. 1985) (quoting *Davis*, 440 U.S. at 631).

*Norman–Bloodsaw v. Lawrence Berkely Lab.*, 135 F.3d 1260 (9th Cir. 1998). Until the Corps. actually completes the consultations, there is still a live ESA controversy. For example, the Corps. and FWS appear to be at odds regarding the proper scope of the consultation.

Defendants submitted that it had already entered into a programatic consultation with FWS which mooted the issue. In its previous Order, the Court did not reach the merits to determine whether the "may effect" standard had been met, as a matter of law, because it reasoned that Defendants' decision to voluntarily enter into § 7 consultation must have been based on a "may effect" determination.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Reconsider is DENIED and Defendants' Motion for Clarification is GRANTED.

**IT IS FURTHER ORDERED** that the Order of October 8, 1999 is affirmed in all parts as clarified above.