BLUE MOUNTAINS BIODIVERSITY PROJECT; Blue Mountain Native Forest Alliance; Society Advocating Natural Ecosystems; Cascadia Fire Ecology Education Project, Plaintiffs–Appellants,

v.

Jeff BLACKWOOD, in his capacity as Supervisor, Umatilla National Forest; United States Forest Service, Defendants–Appellees,

Malheur Lumber Company; Ochoco Lumber Company; Prairie Wood Products; D.R. Johnson Lumber Co.; Malheur Timber Operators; Northwest Forest Resource Council, Intervenors–Defendants– Appellees.

No. 98–35783.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1998.

Decided Dec. 2, 1998.

Marc D. Fink, Boise, Idaho; Jack K. Sterne, Alaska, for plaintiffs-appellants.

Michael K. Martin, United States Department of Justice, Washington, DC, for defendants-appellees.

Scott W. Horngren, Portland, Oregon, for intervenors-defendants-appellees.

Before: FLETCHER and TASHIMA, Circuit Judges, and FITZGERALD,* District Judge.

* The Honorable James M. Fitzgerald, United States Senior District Judge, District of Alaska, sitting by designation.

FLETCHER, Circuit Judge:

We are called upon to determine whether the United States Forest Service ("Forest Service") could award a series of contracts for timber salvage sales in the Umatilla National Forest in eastern Oregon without preparing an Environmental Impact Statement ("EIS") for the largest project and without evaluating the cumulative effects of multiple sales proposed in an area burned by a large wildfire. The Blue Mountains Biodiversity Project, Blue Mountain Native Forest Alliance, Society Advocating Natural Ecosystems, and Cascadia Fire Ecology Education Project (collectively "BMBP") contend that the Forest Service's decision to proceed using an Environmental Assessment instead of a more comprehensive EIS violated the National Environmental Policy Act. The district court denied plaintiffs' motion for summary judgment and permanent injunction and granted the Forest Service's cross-motion for summary judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse and remand with instructions that the Forest Service prepare an EIS.

## FACTUAL AND PROCEDURAL BACKGROUND

The Umatilla National Forest, east of Ukiah, Oregon, includes a portion of the Blue Mountain Range that extends from northeastern Oregon to southeastern Washington. Within the National Forest's borders lies the John Day Basin, the only major river basin in Oregon that contains no dams; it also contains the North Fork of the John Day River, a designated Wild and Scenic River and home to the largest spawning population of summer steelhead and wild spring chinook salmon in the entire Columbia River system.

In August 1996, three wildfires swept through the North Fork John Day watershed. The largest of these fires, the "Tower Fire," engulfed 51,000 acres in a 10–by 14–mile swath. It was the largest wildfire in the recorded history of the Umatilla National Forest. The fire killed all trees, shrubs, and ground cover in several thousand acres. The remaining acreage burned less intensely. In the end, however, the fire depleted stream shade along miles of streams, exposed soils to erosion, deposited sediment into waterways, killed fish, and destroyed fish and wildlife habitat. Over one half of the acres burned in the Tower Fire drain directly into the North Fork of the John Day River, and the remaining area drains into tributaries that eventually enter the river.

This litigation concerns the Forest Service's decision to conduct salvage logging on several thousand acres of burned forest land in the aftermath of the fire without preparing an EIS. Shortly after the fire, the Forest Service assessed the impacts of the fire on the watershed and developed a comprehensive fire recovery strategy. It identified five areas for timber salvage sales within the Tower Fire area. The Big Tower Salvage and Revegetation Project ("Big Tower" project), the largest project to emerge from the planning process, involved three separate timber sales encompassing 4,186 acres and revegetation efforts on an additional 4,500 acres.

The Forest Service estimated that the Big Tower sales would yield 30 million board feet and would remove all remaining trees within the high intensity burn area that were nine inches or greater at breast height.[1] Sixty-five percent of the acreage to be logged—2,720 acres—contained soils with high erosion potential. Tractors would skid logs off 527 of these acres. The project would require eleven miles of new, temporary roads, and seven miles of reconstructed roads.

After completing an Environmental Assessment ("EA") for the project in July 1997, the Forest Service issued a "Finding of No Significant Impact" on September 8, 1997, and declined to prepare an EIS. The Forest Service also amended the Umatilla National Forest Plan because the Big Tower project did not comply with Forest Plan Standards and Guidelines in certain management areas.

The Big Tower EA identified only one of the four other timber sales proposed for the Tower Fire area and contained no discussion of the total quantities of timber or total acreage proposed for logging in the multiple

---

[1] According to the timber purchaser, the actual sale quantity was 23 million board feet. The difference is immaterial to our decision.

sales.[2] The EA also failed to identify the locations of any of the 18 miles of road proposed for construction or reconstruction, or the locations of any proposed stream crossings.

BMBP sought to enjoin the Big Tower salvage sales, alleging that the Forest Service failed to comply with the procedural requirements of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C). Defendants–Intervenors are several logging companies including the company that was awarded the contracts for the salvage sales at issue.

BMBP and the Confederated Tribes of the Umatilla Indian Reservation appealed the Forest Service's decision on September 8, 1997.[3] In December 1997, an Administrative Appeals Officer upheld the Forest Service's decision and BMBP appealed in January 1998. On July 24, 1998, the district court granted summary judgment in favor of the Forest Service and intervenors and denied BMBP's motion for summary judgment and permanent injunction. A panel of this court denied BMBP's emergency motion for an injunction pending appeal, but granted its motion for expedited hearing.

Logging began on the sales encompassing the Big Tower project in August 1998. On November 5, 1998, after hearing oral argument in this case, we enjoined all future logging, road building and other ground disturbing activities within the Tower Fire area of the Umatilla National Forest.[4] Post argument, defendants and intervenors advise that more than 80 percent of the timber in the Big Tower project has been cut and removed. Logging on one of the other sale areas, designed to remove hazard trees along the roads, has also begun. No logging has begun on the other projects identified in the Tower Fire area.

## STANDARD OF REVIEW

■ We review de novo the grant and denial of a district court's order granting and denying summary judgment. *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir.1998). We must determine whether the Forest Service's decision was "based on a consideration of the relevant factors," or whether its actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting the Administrative Procedures Act, 5 U.S.C. § 706(2)(A)). In short, we must ensure that the agency has taken a "hard look" at the environmental consequences of its proposed action. *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526 (9th Cir.1997).

■ Under this deferential standard, we must defer to an agency's decision that is "fully informed and well-considered." *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir.1988). However, we need not forgive a "clear error of judgment." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989). "An agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why potential effects are insignificant." *Save the Yaak*, 840 F.2d at 717.

## ANALYSIS

### 1. NEPA Requirements for an Environmental Impact Statement

The National Environmental Policy Act ("NEPA") requires a federal agency such as

---

**2.** The one referenced sale, the "96 Roadside Salvage," involved logging 6 million board feet on 63 miles of road in the Tower Fire area. An Administrative Appeals Officer reversed the Forest Service's decision on this project in October 1997. In November, 1997, the Forest Service scaled back this project to include only hazard tree removal along 58 miles of road. This new project, renamed the Hairy Hazard project, was categorically excluded from environmental review pursuant to 40 C.F.R. 1508.4.

**3.** The Tribes have reserved treaty rights to hunt, fish, and graze on land within the Tower Fire area. They are not parties to this appeal.

**4.** On November 9, 1998, in response to defendants' request for clarification, we indicated that our injunction does not prohibit road maintenance, water bar installation, ditch and culvert cleaning, or other erosion prevention measures designed to protect the existing roads from winter erosion. The injunction also does not prohibit hunting or other recreational activities except in such areas and to such extent that the Forest Service determines, in its discretion, that defendants' and intervenors' logging activities have created erosion or erosion-inducing conditions that would be exacerbated by such activities.

the Forest Service to prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA "ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989).

A threshold question in a NEPA case is whether a proposed project will "significantly affect" the environment, thereby triggering the requirement for an EIS. 42 U.S.C. § 4332(2)(C). As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40 C.F.R. § 1508.9. An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." *Id.*

If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Save the Yaak,* 840 F.2d at 717. "The statement of reasons is crucial to determining whether the agency took a "hard look" at the potential environmental impact of a project." *Id.* BMBP argues that the Forest Service did not take the requisite "hard look" at the environmental impacts of the Big Tower Project or the cumulative effects of the Big Tower Project and other proposed timber salvage sales. We agree.

■■■ An EIS must be prepared if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." *Idaho Sporting Congress,* 137 F.3d at 1149 (internal quotation omitted). Thus, to prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, a "plaintiff need not show that significant effects will in fact occur." *Id.* at 1150. It is

enough for the plaintiff to raise "substantial questions whether a project may have a significant effect" on the environment. *Id.* We conclude that BMBP raised substantial questions about the environmental impacts of the Big Tower project alone and in combination with the other salvage sales proposed in the Tower Fire area.

We rely on NEPA regulations, promulgated by the Council on Environmental Quality ("CEQ"), to guide our review of an agency's determination of "significance." *See* 40 C.F.R. § 1508.27; *see also Marsh,* 490 U.S. at 372, 109 S.Ct. 1851 (CEQ regulations entitled to substantial deference). To determine whether a proposed project will have "significant" impacts on the environment, an agency must evaluate "the degree to which the effects on the quality of the human environment are likely to be highly controversial," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. §§ 1508.27(b)(4), (b)(5).[5] BMBP contends that the Forest Service failed to evaluate these factors. We discuss each in turn.

First, BMBP argues that the Forest Service failed to evaluate "the degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). We have held that "controversial" is "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1335 (9th Cir.1993); *Sierra Club v. United States Forest Service,* 843 F.2d 1190 (9th Cir.1988). In *Sierra Club,* the Forest Service decided to award several timber contracts that contained groves of giant sequoia redwoods without preparing an EIS. *Sierra Club,* 843 F.2d at 1192. The Sierra Club produced evidence from numerous experts showing the EAs' inadequacies and casting serious doubt on the Forest Service's conclusions. We observed that "[t]his is precisely the type of "controversial" action for which an EIS must be prepared." *Id.* at 1193.

---

5. The regulations identify several other factors that must be analyzed, but plaintiffs only raise these factors on appeal, together with their argument that the cumulative impacts analysis is inadequate.

Here, BMBP argues that a substantial dispute exists concerning the likelihood and significance of adverse environmental effects from post-fire logging and road construction. BMBP points to an independent report on recommendations for ecologically sound post-fire salvage logging, known as the "Beschta report," prepared before the devastating 1996 fires, that recommends minimal intrusion into severely burned areas and no salvage logging in sensitive areas including severely burned areas and erosive sites. According to the Beschta report, there is no ecological need for immediate intervention in post-fire landscapes. A rapid response, the Beschta report explains, may result in unforeseen, detrimental environmental consequences. The Regional Forest Supervisor directed that the Beschta report recommendations be addressed in post-fire environmental review documents, but the Forest Service failed to disclose the report's recommendations in the Big Tower EA.

We offer no opinion on whether the Forest Service's omission of any discussion of the Beschta report, alone, would discredit the Forest Service's decision not to prepare an EIS. We do note that its failure to discuss and consider the Beschta report's recommendations lends weight to BMBP's claim that the Forest Service did not take the requisite "hard look" at the environmental consequences of post-fire logging instead of letting nature do the healing. In any event, we focus on BMBP's arguments regarding the key issue of whether the uncertainty and unknown risks associated with this project require an EIS. *See id.* at 1194.

■ A project may have significant environmental impacts where its effects are "highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). BMBP expressed concern that post-fire salvage logging generates increased sediment loading to the waterways that would cause irreparable damage to the salmon, steelhead, and bull trout populations of the North Fork John Day River, especially in light of the substantial increases in sediment caused by the fire. The Big Tower EA simply fails to persuade that no significant impacts would result from the Big Tower project. We find no documentation of the estimated sediment that would result from the logging and ac-

companying roadbuilding or the impacts of increased sediment on fisheries habitat. The Forest Service's only attempt to measure sedimentation failed when its data collection box overloaded with sediment.

Despite its lack of data, the Forest Service asserts throughout the EA that the expected level of increased erosion and sediment delivery will be small in comparison to that caused by the fire. Whether the increased erosion from logging and roadbuilding is smaller or larger than that produced by the fire is irrelevant. The proper evaluation should identify the impact of the increased sediment from the logging and roadbuilding on the fisheries habitat in light of the documented increases that already have resulted from the fire.

We have warned that "general statements about "possible" effects and "some risk" do not constitute a "hard look" absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1380 (9th Cir.1998). The Forest Service failed to heed that warning. Even though the global EIS for the Umatilla National Forest Plan, as a whole (prepared several years before the fire) acknowledges that "[r]oad building ... has long been recognized as having high risk for initiating short term soil movement and erosion into streams, and degrading water quality and instream habitat," the Big Tower EA never identifies the location of any of the proposed 18 miles of roads or the number of stream crossings, and reveals only that the expected level of increased erosion and sediment delivery will be small in comparison to that caused by the fire. The Umatilla National Forest Plan classifies about half of the area burned by the Tower Fire as a C7–Special Fish Management Area. The EA, however, merely acknowledges that "[c]oncern has been expressed" about the impact of sediment loading caused by post-fire salvage and road building on salmon, steelhead, and bull trout populations in the North Fork John Day River system.

The EA's cursory and inconsistent treatment of sedimentation issues, alone, raises substantial questions about the project's ef-

fects on the environment and the unknown risks to the area's renowned fish populations. We do not find adequate support for the Forest Service's decision in its argument that the 3,000 page administrative record contains supporting data. The EA contains virtually no references to any material in support of or in opposition to its conclusions. That is where the Forest Service's defense of its position must be found. *See* 40 C.F.R. § 1508.9(a) (an environmental assessment is "a concise public document" that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact").

■ We also find the discussion of mitigation measures inadequate. The EA identifies a series of Best Management Practices (BMPs) designed, in part, to reduce the erosion from the logging and roadbuilding activities of the Big Tower project. The Forest Service's reliance on these BMPs, however, is based on "past observations of logging on *unburned* areas" with similar soil types where BMPs have prevented "large increases" in erosion. We find nothing in the EA to support the Forest Service's conclusion that the proposed BMPs will be adequate in a severely burned area where increased levels of erosion have already occurred. We note that even before the fire water quality was suffering. One stream in the area failed to meet Oregon's water quality standards for temperature and another exhibited fish habitat impairment.

■ We also reject the Forest Service's argument that it need not prepare an EIS for the Big Tower project or any of the other proposed sales because these projects may be "tiered" to the Umatilla National Forest Plan EIS and to the other EAs pursuant to federal regulations. "Tiering refers to the coverage of general matters in broader environmental impact statements ... with subsequent narrower statements or environmental analyses." 40 C.F.R. § 1508.28. Nothing in the tiering regulations suggests that the existence of a programmatic EIS for a forest plan obviates the need for any future project-specific EIS, without regard to the nature or magnitude of a project.

Defendants rely on *Oregon Natural Resources Council v. Lyng,* 882 F.2d 1417, 1422–24 (9th Cir.1989), where we held that a Forest Service decision to log six million board feet of dead and insect-infested trees by cable and helicopter systems to avoid building a road into an unroaded portion of a forest did not require a supplemental EIS for the whole forest. They read *Lyng* too broadly. It does not support the proposition that any scale of logging project is exempt from a project-specific EIS simply because an EIS for a forest plan contemplates that logging may occur. In this case, the largest fire in the history of the Umatilla National Forest dramatically altered the forest ecosystem. The fire occurred several years after the EIS for the Forest Plan was prepared. The Forest Plan EIS does not, and could not, evaluate the impacts of this catastrophic fire, or the additional environmental impacts that large scale logging of severely burned areas could bring. We hold that the tiering regulations do not provide the release from the requirement of an EIS that the Forest Service urges.

## 2. Cumulative Impacts

■ We also conclude that the EA is inadequate in addressing the cumulative effects of the multiple salvage logging projects in the Tower Fire area together and in combination with the effects of the fire. A cumulative impact on the environment "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions...." 40 C.F.R. § 1508.7. Cumulative impacts may result from "individually minor but collectively significant actions taking place over a period of time." *Id.* In determining whether a project will have a "significant" impact on the environment, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). If several actions have a cumulative environmental effect, "this consequence must be considered in an EIS." *Cuddy Mountain,* 137 F.3d at 1378 (quoting *City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1312 (9th Cir.1990)).

As part of its Tower Fire recovery strategy, the Forest Service identified five potential logging projects in the same watershed, including the Big Tower project at issue in

this appeal. Together, the sales would yield 40—55 million board feet logged from the same watershed, require approximately 20 miles of road construction and involve tractor-skid logging on steep slopes. No document explores the collective impact of these projects. Although the EA purports to rely on the Forest Service's "Tower Fire Ecosystem Analysis," that study assessed only the impacts of the fire on the watershed not the additional impacts of logging several thousand acres and building several miles of roads. It does not substitute for a meaningful cumulative impacts analysis of the actual logging projects.

BMBP alleges that the Big Tower EA fails to address, or even mention, three of the four other salvage sales proposed for the Tower Fire area. Relying on the Forest Service's own acknowledgment that the five sales are part of a coordinated Tower Fire recovery strategy, BMBP argues that the Forest Service should have evaluated the cumulative impacts of these sales in a single EIS. We agree.

█ "Significance cannot be avoided by ... breaking [an action] down into small component parts." 40 C.F.R. § 1508.27(b)(7). We recognize that "the determination of the extent and effect of [cumulative impact] factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies." *Kleppe v. Sierra Club,* 427 U.S. 390, 414, 96 S.Ct. 2718, 2732, 49 L.Ed.2d 576 (1976)(holding that the Department of the Interior did not need to complete a region wide EIS for all potential mining projects in the Northern Great Plains area). We also recognize that "NEPA does not require the government to do the impractical." *Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754, 764 (9th

Cir.1996). Here, however, all of the proposed sales were reasonably foreseeable. They were developed as part of a comprehensive forest recovery strategy. In fact, all five sales were disclosed by name to a coalition of logging companies, along with estimated sale quantities and timelines even before the Big Tower EA was completed.[6] At the very least, these sales raise substantial questions that they will result in significant environmental impacts. A single EIS, therefore, was required to address the cumulative effects of these proposed sales. *Cuddy Mountain,* 137 F.3d at 1380.

█ Although we now impose the "snag" that the Forest Service feared but the law requires, the Forest Service has largely succeeded in its strategy. In the two and one-half months between the denial of plaintiffs' motion for injunction pending appeal and our injunction following oral argument, over half of the trees in the Big Tower project area have been cut and removed without the benefit of meaningful environmental analysis. Plaintiffs' appeal is not rendered moot, however, because trees remain standing in the Big Tower area and the Forest Service has not yet acted on its remaining proposed sales in the Tower Fire area. *See Kettle Range Conservation Group v. United States Bureau of Land Management,* 150 F.3d 1083 (9th Cir.1998)(per curiam)(enjoining BLM from transferring the remaining 10 percent of land under a land exchange found in violation of NEPA even where 90 percent of the land had already been transferred and logged by private parties in violation of NEPA).

Although the district court is to be commended for its close attention to the details of the piece-meal studies undertaken by the Forest Service, it erred in not directing its analysis to the overall purpose of NEPA and its requirement that an EIS be prepared under the circumstances of the major actions proposed in this case in the wake of the great fire. NEPA "is our basic national charter for protection of the environment." 40

---

6. What appears to be a decision by the Forest Service to make identified timber sales in advance of the completion of the Big Tower EA raises serious questions. In its "Umatilla National Forest Fire Recovery Strategy and Timelines," dated December 1996, the Forest Service explained that its decision to "conduct separate NEPA analysis on subsequent projects ... not only simplifies the NEPA analysis, but ... also allows some projects to move forward if other projects get snagged in appeals and/or litiga-

tion." Expediency and prejudice in favor of logging over NEPA compliance and adequate concern for the environment also appear in a July 1997 letter from the acting Forest Supervisor to logging companies. After observing that "due to the unique fisheries and water quality values in the [Tower Fire area], it is envisioned that the area will be controversial," he noted that the Forest Service's strategy for forest recovery "emphasizes multiple, smaller scale project NEPA preparation to achieve quick success."

**1216**

C.F.R. § 1500.1(a). NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh*, 490 U.S. at 371, 109 S.Ct. 1851. An EIS is required of an agency in order that it explore, more thoroughly than an EA, the environmental consequences of a proposed action whenever "substantial questions are raised as to whether a project *may* cause significant [environmental] degradation." *Idaho Sporting Congress*, 137 F.3d at 1149. That is exactly the circumstances of this case.

Our decision does not jeopardize the Forest Service's ability to undertake emergency measures in the wake of a disaster. Here, the catastrophic fire burned in August of 1996. The logging began in August of 1998. The Forest Service had ample opportunity and an obligation to undertake a more searching environmental review or to propose activities on a much smaller scale. Although NEPA "does not mandate particular results," it does "prescribe the necessary process." *Methow Valley*, 490 U.S. at 350, 109 S.Ct. 1835.

### CONCLUSION

The Forest Service has failed to take the "hard look" at the effects of the proposed timber sales that NEPA requires. The Forest Service has not discharged its obligation to undertake a thorough environmental analysis before concluding that no significant environmental impact exists from salvage logging sales in the Tower Fire area. Although our review under the arbitrary and capricious standard is deferential, it does not condone a "clear error of judgment." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851.

In this case, the Forest Service made a clear error of judgment in its decision to prepare only an EA for the Big Tower project and in its failure to analyze the combined effects of several salvage sales in the same watershed developed as part of a coordinated fire recovery strategy. Accordingly, we REVERSE and REMAND to the district court with directions that it remand to the Forest Service for further proceedings consistent with this opinion. The injunction issued by this Court on November 5, 1998, as clarified on November 9, 1998, shall remain in full force and effect until the Forest Service satisfies its NEPA obligations.