**SIERRA NEVADA FOREST PROTECTION CAMPAIGN; Plumas Forest Project; Earth Island Institute; Center for Biological Diversity, Plaintiffs—Appellants,**

v.

**UNITED STATES FOREST SERVICE; Jack Blackwell, Regional Forester, Region 5 United States Forest Service; James M. Pena, Forest Supervisor, Plumas National Forest, Defendants—Appellees,**

**Quincy Library Group, an unincorporated citizens group; Plumas County, Defendant–Intervenors—Appellees.**

No. 05–15921.

United States Court of Appeals, Ninth Circuit.

Argued & Submitted Dec. 6, 2005.

Filed Jan. 19, 2006.

Michael R. Sherwood, Esq., George M. Torgun, Esq., Oakland, CA, Rachel Marie Fazio, Esq., Cedar Ridge, CA, for Plaintiffs–Appellants.

Lisa E. Jones, Esq., Brian C. Toth, Esq., Rachel Dougan, Esq., U.S. Department of Justice Environment & Natural Resources Division, Washington, DC, Edmund Brennan, Office of the U.S. Attorney, Sacramento, CA, for Defendants–Appellees.

Michael B. Jackson, Quincy, CA, for Defendants–Intervenor–Appellees.

Before: B. FLETCHER, THOMPSON, and BEA, Circuit Judges.

## MEMORANDUM *

Petitioners, Sierra Nevada Forest Protection Campaign, Plumas Forest Project, Earth Island Institute, and Center for Biological Diversity (collectively "SNFPC"), appeal the district court's grant of summary judgment in favor of the respondents United States Forest Service ("FS") and intervenor Quincy Library Group. SNFPC asserts that FS failed to comply with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, in approving the Meadow Valley Defensible Fuel Profile Zone and Group Selection Project ("MVP"). FS approved the MVP by issuing a Finding of No Significant Impact ("FONSI") after analyzing the project in an Environmental Assessment ("EA"), rather than preparing an Environmental Impact Statement ("EIS"), which would have involved a more rigorous analysis. *See Klamath–Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir.2004) (citing 40 C.F.R. §§ 1502.1, 1508.9, 1508.13).

SNFPC claims that the EA failed to consider the cumulative impacts of nearby projects together with the MVP on the California spotted owl. SNFPC also asserts that the EA failed to consider what it contends are highly uncertain effects and unique or unknown risks that the MVP may have on the owl and on nearby communities. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm the district court's summary judgment.

We review a district court's grant of summary judgment de novo. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir.2005). Pursuant to the Administrative Procedure Act, this court must set aside an agency's actions, findings, and conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ocean Advocates*, 402 F.3d at 858 (quoting 5 U.S.C. § 706(2)(A)). This standard of review is "narrow," and "[t]he court is not empowered to substitute its judgment for that of the agency." *Klamath–Siskiyou*, 387 F.3d at 993 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). "However, we need not forgive a 'clear error of judgment.' " *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir.1998) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). In other words, the court's "task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action." *Klamath–Siskiyou*, 387 F.3d at 993 (quoting *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir.2001)).

## A. Cumulative Impacts of Future Projects

SNFPC first contends that the EA insufficiently analyzed the cumulative impacts of the MVP, together with reason-

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

ably foreseeable future projects, on the California spotted owl. Specifically, SNFPC points to several timber projects proposed "nearby" the MVP that were not considered in the EA. FS used the following approach to decide which future projects to include in the cumulative impacts analysis.

FS designated a "wildlife analysis area" for the purposes of "assess[ing] potential effects on threatened, endangered, and sensitive ... wildlife species." If FS did not expect a future project to have impacts within the MVP "wildlife analysis area," it did not consider that future project's cumulative impacts in the MVP EA. Whereas the MVP planned harvesting on 6,400 non-contiguous acres (the smallest contiguous circumscribing region is about 50,400 acres), the "wildlife analysis area" covered 85,900 acres. As discussed below, FS designated the 85,900–acre area based on the location of Home Range Core Areas (HRCAs), which constitute the "best available spotted owl habitat" surrounding known or suspected nest stands. California spotted owls spend the majority of their time, and conduct the majority of their nesting and foraging, in HRCAs.

■ Although the MVP provides for some harvesting within HRCAs, the "wildlife analysis area" includes a ring of HRCAs that surrounds all harvesting activity, and within which no harvesting will occur. We have previously acknowledged the legitimacy of using prescribed units such as HRCAs for designating the area within which future projects must have impacts to be considered in a cumulative impacts review. *See Selkirk Conservation Alliance v. Forsgren,* 336 F.3d 944, 960 (9th Cir.2003) (upholding FS's reliance on a "Bear Management Unit" in determining whether to include future projects in a cumulative impacts review). Here, where

the "wildlife analysis area" included, along its internal border, an insulating layer of HRCAs in which no harvesting would take place, FS did not arbitrarily or capriciously restrict the scope of its cumulative impacts review.

SNFPC neither argues nor provides project-specific evidence suggesting that any of the "nearby" projects will have impacts within the MVP "wildlife analysis area." We defer, therefore, to FS's determination that they will not. We conclude that FS was not obligated to consider the cumulative impacts of those projects, and that the MVP EA's consideration of future projects was sufficient.

**B. Cumulative Impacts of Past and Present Projects**

SNFPC next argues that the EA insufficiently considered the cumulative impacts of past and present projects within the "wildlife analysis area." The EA incorporates the MVP Biological Assessment/Biological Evaluation (BA/BE) by reference. Using the so-called "CWHR Habitat Classification Scheme," the BA/BE lists the individual impacts that past projects dating from 1994 have had on suitable spotted owl nesting and foraging habitat within the MVP "wildlife analysis area." The BA/BE and EA also estimate how much suitable spotted owl nesting and foraging habitat remains in the "wildlife analysis area" given the impact from past projects, and estimate the MVP's additional impact on such habitat. The EA thereby describes both the incremental and the cumulative impacts of past projects within the "wildlife analysis area."

■ As for present projects, the EA describes the effects that the one ongoing project in the "wildlife analysis area" will have on HRCAs, and combines these effects with the MVP's projected impacts.[1]

---

1. FS could not have conducted a similar HRCA-based analysis for past projects, because FS first adopted the HRCA designation after the past projects were completed.

It separately describes the ongoing project's impacts on suitable nesting and foraging habitat (using the CWHR scheme) inside the "wildlife analysis area." As a result, the EA adequately considers the cumulative impacts of present projects together with the MVP.

## C. Highly Uncertain Effects or Unique or Unknown Risks

In the NEPA regulations, cumulative impacts—the issues discussed above—are the seventh item on a ten-item list that an agency must consider when determining whether to prepare an EIS. See 40 C.F.R. 1508.27(b). SNFPC also challenges FS's failure to consider the fifth item on that list, which is "[t]he degree to which the possible effects on the ... environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. 1508.27(b)(5). Specifically, FS contends that the MVP presents such uncertainty and risks both for its impacts on the owls and for its potential impacts on the safety of nearby communities.

With regard to the owls, cumulative impacts are obviously relevant to determining whether the MVP poses a high degree of uncertainty or unique or unknown risks. We have already concluded that the EA's cumulative impacts review was sufficient; thus, we turn now to the EA's consideration of the MVP's direct and indirect impacts on the owl.

■ FS reasonably assessed the direct and indirect impacts of logging within the analysis area, and more specifically, on an individual HRCA basis. Again using the CWHR scheme, the BA/BE states that the MVP will render unsuitable 13.4% of total foraging habitat and 5.4% of total nesting habitat within the "wildlife analysis area." It reveals that MVP treatments will render 12% of HRCA acreage within the "wildlife analysis area" unsuitable. The BA/BE then dissects the MVP's impact on

the sixteen HRCAs in which MVP treatments will occur. This tabular breakdown includes total acres treated, percentage of the HRCA treated, a historical measure of how often owls nest in the HRCA, and a subjective rating for the risk that MVP activity will cause owls to stop nesting within the HRCA. Based partly on that table, and on additional analysis, the BA/BE ultimately concludes that while "owl behavioral and competitive interactions may increase slightly," owl occupancy within each HRCA "should remain the same as pre-treatment." FS did not reach this conclusion arbitrarily or capriciously.

The BA/BE admits some degree of uncertainty regarding how the MVP will affect woodrats and flying squirrels, which are important prey species preferred by spotted owls. It then explains reasons to believe that adverse effects would be temporary, and that "habitat modeling" conducted for prior NEPA documents suggests that many of the MVP harvests would not significantly impact important prey populations in the short- or long-term. SNFPC argues that FS failed to account for the "well-established" phenomenon whereby "edges" created by logging correlate to a reduced prevalence of flying squirrels in the forest. There is no indication, however, that this would affect FS's conclusions, or that the prior "habitat modeling" also failed to consider this phenomenon. As a result, FS did not reach this conclusion arbitrarily or capriciously.

After considering the direct, indirect, and cumulative impacts of the MVP on the California spotted owl, FS issued a FONSI concluding that the MVP would not threaten current owl distribution or viability. This constitutes a finding that the MVP would not have highly uncertain effects or pose unique or unknown risks to the owl. As described above, FS supported its conclusion with analysis that we cannot say

was arbitrary or capricious. In other words, FS took the requisite "hard look" at the impacts that the MVP would have on the spotted owl.

With regard to surrounding communities, SNFPC argues that FS inadequately considered how logging debris ("slash") generated by the MVP would affect the safety of those communities by exposing them to heightened risks of fire. Slash is an inevitable feature of harvesting timber, and creates an increased fire hazard until "treated." Nothing in the record suggests that the MVP will generate abnormal amounts of slash.[2] Moreover, SNFPC has not produced evidence that FS's timetable for treating slash is unusually protracted. FS acknowledges that, for some units, there "could be" a three-to-five-year lag between the completion of harvesting activity and the completion of treatment. Nonetheless, FS clearly indicated an ongoing fuel reduction process during this time, as well as the typicality of the schedule: "While this lag time does temporarily increase the loading of surface fuels over some of the project area, this has been acknowledged and is normal for such fuel reduction activities."

Absent strong evidence of excessive slash, excessive lag time, or other extenuating circumstances particular to the MVP, we conclude that FS took the requisite "hard look" at this inevitable feature of timber harvesting. *Cf. Blue Mountains*, 161 F.3d at 1213 (holding that, where a "devastating" fire had already caused increased sedimentation in local streams and fisheries, FS needed to present data of additional sediment increases due to timber sales and road building projects in the area). Because SNFPC has not produced such evidence,[3] we hold that FS adequately considered the risks that MVP slash would pose to nearby communities.

### D. Conclusion

The EA demonstrates a "hard look" at the MVP's impacts both on the California spotted owl and on the safety of nearby communities. Accordingly, we affirm the district court's summary judgment in favor of FS. Because we affirm the district court on the merits, SNFPC's request for an injunction pending FS's compliance with NEPA is moot.

**AFFIRMED.**

BETTY B. FLETCHER, Circuit Judge, specially concurring.

I concur and write separately to clarify one point. The cumulative impact of the MVP and any future project will necessarily be considered in the EIS or EA of the future project; that is the appropriate time for such cumulative impact analysis to be conducted.

2. SNFPC cites portions of the record that discuss the MVP's treatment plan for large amounts of "surface fuels." Although "surface fuels" include slash, they also include the preexisting debris that had accumulated to substantial levels prior to the MVP. The record does not suggest that, in the short-term, MVP slash will contribute significantly to preexisting conditions. By contrast, the record states that, in the long-term, MVP treatment activities will "substantially diminish" surface fuels relative to their pre-project levels.

3. SNFPC's only evidence explains the general dangers of untreated slash, and states that, in the MVP "slash would be on the ground presenting an increased fire hazard right after logging, and then for at least 5–7 years, if not longer." As FS correctly points out, this clearly misstates the treatment schedule.