THOMAS, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority’s holding that the Bureau’s cumulative effects analysis was insufficient under NEPA, and its consequent reversal of the district court’s grant of summary judgment as to that issue. However, I respectfully dissent from the conclusion that Leeville and the Amended South Project are not connected actions requiring a single, comprehensive EIS.
A careful analysis of the record demonstrates that the Bureau should have prepared a single comprehensive EIS for Lee-ville and the Amended South Project. Leeville is dependent on the South Operations Area Project. Because the Amended South Project is merely, in the agency’s words, “an expansion of’ the South Operations Area Project, Leeville and the Amended South Project are necessarily connected actions for NEPA purposes.
Employment of the “independent utility” test does not lead to a different conclusion. The benchmark of “independent utility” is whether “ ‘each of two projects would have taken place with or without the other and thus had independent utility.’ ” Wetlands Action Network v. U.S. Army Corps of Eng’rs, 222 F.3d 1105, 1118 (9th Cir.2000). When one of the projects might reasonably have been completed without the other, each has independent utility and they are not ‘connected’ for NEPA purposes. Native Ecosystems Council v. Dombeck, 304 F.3d 886, 894 (9th Cir.2002). The sole purpose behind the Leeville mine is to obtain gold and other minerals from the solids mined. For this to be accomplished, those solids must be processed after extraction. The solids extracted at Leeville are sent to the South Operations Area Project for processing. The Leeville draft EIS states that “[o]re hoisted to the surface would be hauled directly to processing facilities at the Refractory Ore Treatment Plant (Mill # 6) located at Newmont’s South Operations Area [Project], or placed in a refractory ore 8654 stockpile approximately one-half mile west of the production shaft”.[1] “The total amount of ore [and waste rock] hoisted to the surface” is around 18 million tons. The two projects are clearly interconnected and should be considered in a single EIS.
Our case law supports this conclusion. In Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1215(9th Cir.1998) and Thomas v. Peterson, 753 F.2d 754, 758 (9th Cir.1985), we determined (1) that five logging projects in one watershed, and (2) a logging project and a road to facilitate it, respectively, had to be con *977 sidered in comprehensive EISs. Proper application of Blue Mountains and Thomas dictate that a single EIS should have been prepared in this case.
The Bureau relies on Wetlands Action Network, 222 F.3d at 1119, and Sylvester v. U.S. Army Corps of Engineers, 884 F.2d 394, 400 (9th Cir.1989), in which we held that comprehensive EISs were not required for (1) three phases of a wetlands filling project, and (2) a resort complex and golf course. However, those cases are distinguishable from the present circumstance.
In Sylvester, we noted that the resort and golf course “each could exist without the other, although each would benefit from the other’s presence.” Sylvester, 884 F.2d at 400. Similarly, we reasoned in Wetlands Action Netivork that “the utility of [the first] part of the project does not depend upon the completion of the later phases of the projeet[, and i]t would not be unwise or irrational to undertake the building of Phase I even if it was determined that the later phases could not be constructed.” 222 F.3d at 1118.
Leeville and the Amended South Project are more akin to the logging project and logging road than the resort complex and golf course. It would be not merely unwise, but also entirely irrational to proceed with the mining of Leeville in the absence of available processing facilities.[2] See id.; see also Trout Unlimited v. Morton, 509 F.2d 1276, 1285(9th Cir.1974) (requiring a single EIS where “[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken”). The South Operations Area Project processing facilities are therefore more like the logging road in Thomas, which was essential to the logging operation at issue, than the golf course in Sylvester, which was beneficial but not essential. Rather than merely “benefit[ting] from the ... presence” of the South Operations Area Project, the Leeville project could not exist without a processing facility. This facility is in the South Operations Area Project, and so the agency should have prepared a single EIS to analyze the impact of both Leeville and the expansion of the South Operations Area Project, the Amended South Project.
To the Bureau, Leeville’s dependence on the South Operations Area Project is unproblematic; it accepts the contention that the South Operations Area Project and the Amended South Project are distinct and unconnected. However, the record is replete with the Bureau’s assertions that the Amended South Project is, for all relevant purposes, nothing more than an expansion of the South Operations Area Project. For example, the final EIS for the Amended South Project describes the project as “activities that would support continued operation and expansion of existing gold mining and processing at [Newmont’s] South Operations Area Projects which] would not cause any new kinds of [environmental] impacts ... but would extend the time period during which existing impacts would continue.” The Amended South Project represents the expansion from the 7,960 total acres disturbed by the South Operations Area Project to 9,352 total *978 acres, disturbed by the South Operations Area Project and the Amended South Project together. Indeed, in preparing the final EIS for the Amended South Project, the Bureau noted that “[i]n many cases, the EIS will refer to the original South Operations Area Project EIS rather than repeat information that has not changed substantially [since the preparation of that document].” Similarly, in response to a comment by Mineral Policy Center that “[d]ue to the complexity, size, and importance of the current [draft EIS] (and[cumulative impacts analysis]), the sixty day comment period[wa]s not nearly sufficient for full and competent response,” the agency simply noted that it “considered] 60 days to be adequate because this Plan of Operations is an expansion of an existing project.”
It is illogical for the agency to assert the Amended South Project’s intense connection to the South Operations Area Project when convenient, only to deny that same connection in order to justify the refusal to prepare a single EIS for the Leeville and Amended South Projects. Permitting the Bureau to do so would impermissibly allow the agency to “divid[e] a project into multiple ‘actions,’ each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.” Wetlands Action Network, 222 F.3d at 1118(internal quotation marks and citation omitted). Here, the asserted division between the Amended South Project and the South Operations Area Project acts to insulate Leeville from the Amended South Project, in contravention of both CEQ guidelines and our caselaw.
For these reasons, I conclude that a single, comprehensive EIS was required and would reverse the district court’s grant of summary judgment for the defendants as to this issue, as well as the cumulative impacts analysis. I therefore respectfully dissent.

. Presumably, the ore placed in the stockpile is stored there until it also goes to the South Operations Area Project for processing. Even if it does not, however, the analysis is unaltered, applying with the same force to a portion of the mined solids as to the whole.

. The Bureau also relies on the fact that tailing from processing Leeville ore at the South Operations Area Project would be deposited in existing tailing disposal facilities. The tail-ings are the waste products that remain after the valuable components are isolated and extracted through processing. Because processing is itself an essential step, and processing at the South Operations Area Project is sufficient to defeat Leeville’s "independent utility,” it is irrelevant that disposal of post-processing tailing does not show Leeville’s further dependency on the South Operations Area Project.