FILED

**NOT FOR PUBLICATION**

JUL 15 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT and CENTER FOR BIOLOGICAL DIVERSITY, | No. 11-15799 |
| Plaintiffs - Appellants, | D.C. No. 3:11-cv-00053-HDM-VPC |
| v. | |
| BUREAU OF LAND MANAGEMENT, | MEMORANDUM[*] |
| Defendant - Appellee, and | |
| SPRING VALLEY WIND LLC, | |
| Intervenor-Defendant - Appellee. | |

Appeal from the United States District Court
for the District of Nevada
Howard D. McKibben, Senior District Judge, Presiding

Argued and Submitted July 11, 2011
San Francisco, California

Before: HUG, SILVERMAN, and GRABER, Circuit Judges.

---

[*]    This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Plaintiffs appeal the district court's order denying their motion for a preliminary injunction. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). We agree with the reasons thoughtfully expressed by the district court and find no abuse of discretion.

We have pendent appellate jurisdiction over the district court's order striking the declaration of Plaintiffs' expert. Hendricks v. Bank of Am., N.A., 408 F.3d 1127, 1134 (9th Cir. 2005). Reviewing for abuse of discretion, we affirm.

**AFFIRMED.**

Western Watersheds Project v. Bureau of Land Management, No. 11-15799

GRABER, Circuit Judge, concurring in part:

I concur in the result. I write separately, however, to express my concern about the district court's conclusion that Plaintiffs are unlikely to succeed on the merits. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 374 (2008).

I agree with the majority that the district court did not abuse its discretion by determining that the project's construction is unlikely to cause irreparable harm to bats or sage grouse. Nor did the district court err when balancing the equities in Defendants' favor or when considering the public's interest in the project.

In my view, however, Plaintiffs are likely to succeed on the merits because the BLM failed adequately to consider the potentially significant cumulative impacts of the project and other reasonably foreseeable future actions. The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(C), requires federal agencies to prepare a full Environmental Impact Statement ("EIS") "if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." Blue Mountains Biodiversity

Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998) (internal quotation marks and ellipses omitted). An agency must consider 10 "intensity" factors, including potentially significant cumulative impacts, to determine whether an EIS is necessary. 40 C.F.R. § 1508.27(b).

Although a good start, the BLM's cumulative impacts analysis was legally insufficient. The BLM's Environmental Assessment ("EA") included a table, which the district court characterized as "detailed." That table, however, states little more than the names of all reasonably foreseeable future projects, their locations, the number of wind turbines expected at each project, whether transmission lines would be necessary, and the number of acres that would be disturbed for each project. Based on the BLM's estimates, future projects will add another 995 wind turbines to the region, of which 225 would be in Spring Valley. In addition to including the table, the EA's section on cumulative impacts notes that the foreseeable actions "would result in further mortality" to bats from collisions and barotraumas and that "[c]umulative impacts to bats are anticipated to be similar to those described for birds; however, because of the proximity to Rose Guano Cave, there is the potential for a somewhat larger percent increase in mortality for Brazilian free-tailed bats." Further, the EA remarks that, "because of the great distances Brazilian free-tailed bats are known to migrate and the addition of multiple wind energy facilities to the

2

north and south of the [Spring Valley Wind Energy Facility], there is the potential for a somewhat larger percent increase in mortality for Brazilian free-tailed bats throughout eastern Nevada."

With regard to sage grouse, the EA states only that "past and present actions have contributed to the direct loss of habitat" and "habitat fragmentation" and that foreseeable future actions "would contribute up to 5,810 acres of short- and long-term habitat loss and even greater habitat fragmentation" which, when combined with this project, "represents approximately 3.3% of available greater sage-grouse habitat . . . in Spring Valley."  That is all.

The BLM's statements regarding "further mortality," "a somewhat larger percent increase in mortality," and "greater habitat fragmentation" are precisely the type of "[g]eneral statements about possible effects and some risk" that we have rejected as legally insufficient in the absence of an explanation as to why more definitive information was unavailable.  Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004) (internal quotation marks omitted); see id. at 994 (rejecting as insufficient statements that a particular environmental factor was "unchanged," "improved," or "degraded" and whether the change was "major" or "minor").  The BLM did not explain why it could not estimate the number of bat fatalities that would occur at the additional facilities, just as it had for the current

3

project.  Further, the BLM made no attempt to analyze habitat fragmentation, stating only that it would be "greater."

In addition to suffering from a lack of quantitative analysis, the EA's cumulative impact statement provides no useful discussion of the <u>actual</u> effect that this project and future projects would have on bat or sage grouse populations.  <u>See id.</u> at 994–95 (a quantitative analysis of direct impacts is not a "sufficient description of the actual environmental effects that [may] be expected").  The BLM's recitation of the number of wind turbines to be erected and the acres of habitat to be destroyed is legally insufficient, just as the tally of acres logged or roads built was legally insufficient in <u>Klamath-Siskiyou</u>.  <u>Id.</u>

Moreover, tiering to the 2005 Final Programmatic EIS on Wind Energy Development on BLM Administered Lands in the Western United States ("Wind PEIS") does not cure the EA's lack of analysis.  With regard to the cumulative impacts on bats and birds caused by wind energy development in 11 western states, the Wind PEIS states only:

> On the basis of bird and bat monitoring studies at existing wind energy projects, the contribution of wind projects to the cumulative impacts on birds and bats would likely be minimal in comparison with population declines from other causes (e.g., habitat loss or fragmentation). However, some species could incur population-level effects.

That statement is as general and conclusory as the analysis appearing within the EA.

4

See id. at 997 (tiering to an EIS was insufficient to cure an EA's shortcomings where the EIS contained only general statements about the cumulative effects of logging in the area but mentioned no information specific to the timber sales at issue).

Finally, the EA's "discussion of the [project's] direct effects in lieu of a discussion of cumulative impacts is inadequate." Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior, 608 F.3d 592, 604 (9th Cir. 2010). Even assuming that the BLM's mitigation measures will reduce the mortality rate to 192 bats per year, which is not at all certain, such a seemingly minor number may have significant effects. See 40 C.F.R. § 1508.7 ("Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."). Even if the habitat loss and fragmentation caused by the current project are minimal and involve only low-quality habitat, that minimal harm must be considered in light of the estimated loss of 5,810 additional acres. The BLM failed to perform such an analysis and, in my view, Plaintiffs are therefore likely to succeed on the merits of their NEPA claims.

5