**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

APR 3 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| BARK; et al., | No. 19-35665 |
| Plaintiffs-Appellants, | D.C. No. 3:18-cv-01645-MO |
| v. | |
| UNITED STATES FOREST SERVICE, a federal agency, | MEMORANDUM[*] |
| Defendant-Appellee, | |
| HIGH CASCADE, INC., | |
| Intervenor-Defendant-Appellee. | |

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted December 10, 2019
Seattle, Washington

Before: GRABER, BERZON, and HIGGINSON,[**] Circuit Judges.

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**] Stephen A. Higginson, United States Circuit Judge for the U.S. Court of Appeals for the Fifth Circuit, sitting by designation.

Appellants Bark, Cascadia Wildlands, and Oregon Wild timely appeal the

district court's summary judgment in favor of Appellees, the United States Forest

Service (USFS) and High Cascade, for claimed violations of the National

Environmental Policy Act (NEPA) and the National Forest Management Act

(NFMA). Reviewing de novo the district court's grant of summary judgment,

*Center for Biological Diversity v. Ilano*, 928 F.3d 774, 779 (9th Cir. 2019), we

hold that the USFS's determination that the Crystal Clear Restoration (CCR)

Project did not require an Environmental Impact Statement (EIS) was arbitrary and

capricious and so reverse. We do not reach the NFMA claims.

The USFS's decision not to prepare an EIS was arbitrary and capricious

under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), for two

independent reasons.

1. The effects of the Project are highly controversial and uncertain, thus

mandating the creation of an EIS. *See* 40 C.F.R. § 1508.27(b)(4) & (5) (listing

relevant factors for whether an EIS is required, including if the project's effects are

"highly controversial" and "highly uncertain"). The stated primary purpose of the

CCR Project is to reduce the risk of wildfires and promote safe fire-suppression

activities, but Appellants identify scientific evidence showing that variable density

thinning will not achieve this purpose. Considering both context and intensity, as

required by 40 C.F.R. § 1508.27, this evidence raises substantial questions about

the Project's environmental impact, and an EIS is required. *See, e.g., Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (holding that an EIS is required when an environmental assessment raises "substantial questions" about whether an agency's action will have a significant effect on the quality of the human environment); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238–39 (9th Cir. 2005).

"A project is 'highly controversial' if there is a 'substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use.'" *Native Ecosystems Council*, 428 F.3d at 1240 (alteration in original) (quoting *Blackwood*, 161 F.3d at 1212). "A substantial dispute exists when evidence . . . casts serious doubt upon the reasonableness of an agency's conclusions." *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1069 (9th Cir. 2014) (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001), *abrogated in part on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010)). To demonstrate a substantial dispute, appellants must show that "evidence from numerous experts" undermines the agency's conclusions. *Blackwood*, 161 F.3d at 1212. "[M]ere opposition alone is insufficient to support a finding of controversy." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019).

The Environmental Assessment (EA) explained that the CCR Project will

use "variable density thinning" to address wildfire concerns. "In variable density thinning, selected trees of all sizes . . . would be removed." This process would assertedly make the treated areas "more resilient to perturbations such as . . . large-scale high-intensity fire occurrence because of the reductions in total stand density." Variable density thinning will occur in the entire Project area.

Substantial expert opinion presented by the Appellants during the administrative process disputes the USFS's conclusion that thinning is helpful for fire suppression and safety. For example, Oregon Wild pointed out in its EA comments that "[f]uel treatments have a modest effect on fire behavior, and could even make fire worse instead of better." It averred that removing mature trees is especially likely to have a net negative effect on fire suppression. Importantly, the organization pointed to expert studies and research reviews that support this assertion.

Bark also raised this issue: "It is becoming more and more commonly accepted that reducing fuels does not consistently prevent large forest fires, and seldom significantly reduces the outcome of these large fires," citing an article from *Forest Ecology and Management*. Bark also directed the USFS to a recent study published in *The Open Forest Science Journal*, which concluded that fuel treatments are unlikely to reduce fire severity and consequent impacts, because often the treated area is not affected by fire before the fuels return to normal levels.

Bark further noted that, while "Bark discussed [during the scoping process] the studies that have found that fuel reduction may actually exacerbate fire severity in some cases as such projects leave behind combustible slash, open the forest canopy to create more ground-level biomass, and increase solar radiation which dries out the understory[,] [t]he EA did not discuss this information."

Oregon Wild also pointed out in its EA comments that fuel reduction does not necessarily suppress fire. Indeed, it asserted that "[s]ome fuel can actually help reduce fire, such as deciduous hardwoods that act as heat sinks (under some conditions), and dense canopy fuels that keep the forest cool and moist and help suppress the growth of surface and ladder fuels . . . ." Oregon Wild cited more than ten expert sources supporting this view. Importantly, even the Fuels Specialist Report produced by the USFS itself noted that "reducing canopy cover can also have the effect of increasing [a fire's rate of spread] by allowing solar radiation to dry surface fuels, allowing finer fuels to grow on . . . the forest floor, and reducing the impact of sheltering from wind the canopy provides."

The effects analysis in the EA did not engage with the considerable contrary scientific and expert opinion; it instead drew general conclusions such as that "[t]here are no negative effects to fuels from the Proposed Action treatments." Appellants thus have shown a substantial dispute about the effect of variable density thinning on fire suppression. Although it is not our role to assess the merits

of whether variable density thinning is indeed effective in the project area to prevent fires, or to take sides in a battle of the experts, *see Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992), NEPA requires agencies to consider all important aspects of a problem. *See WildEarth Guardians v. U.S. E.P.A.*, 759 F.3d 1064, 1069–70 (9th Cir. 2014). Throughout the USFS's investigative process, Appellants pointed to numerous expert sources concluding that thinning activities do not improve fire outcomes. In its responses to these comments and in its finding of no significant impact, the USFS reiterated its conclusions about vegetation management but did not engage with the substantial body of research cited by Appellants. Failing to meaningfully consider contrary sources in the EA weighs against a finding that the agency met NEPA's "hard look" requirement as to the decision not to prepare an EIS. *Blackwood*, 161 F.3d at 1213. This dispute is of substantial consequence because variable density thinning is planned in the entire Project area, and fire management is a crucial issue that has wide-ranging ecological impacts and affects human life. When one factor alone raises "substantial questions" about whether an agency action will have a significant environmental effect, an EIS is warranted. *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) ("We have held that one of [the NEPA intensity] factors may be sufficient to require preparation of an EIS in appropriate circumstances."). Thus, the USFS's decision not to prepare an EIS was

6

arbitrary and capricious. *See Blackwood*, 161 F.3d at 1213 (holding that conflicting evidence on the effects of ecological intervention in post-fire landscapes made a proposed project highly uncertain, thus requiring an EIS).

2. The USFS also failed to identify and meaningfully analyze the cumulative impacts of the Project. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* "[I]n considering cumulative impact, an agency must provide 'some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'" *Ocean Advocates*, 402 F.3d at 868 (alterations in original) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998)). "This cumulative analysis 'must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects.'" *Id.* (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002)) (internal quotation marks omitted). We have held that cumulative impact analyses were insufficient when they "discusse[d] only the direct effects of the project at issue on [a small area]" and

merely "contemplated" other projects but had "no quantified assessment" of their combined impacts. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004).

The EA ostensibly analyzed the cumulative effects of the CCR Project, and included a table of other projects that were "considered in the cumulative effects analyses." The cumulative impact analysis is insufficient because there is no meaningful analysis of any of the identified projects. The table gave no information about any of the projects listed; it merely named them. The section of the EA actually analyzing the cumulative effects on vegetation resources did not refer to any of these other projects. Nor are there any specific factual findings that would allow for informed decision-making. The EA simply concluded that "there are no direct or indirect effects that would cumulate from other projects due to the minimal amount of connectivity with past treatments" and that the Project "would have a beneficial effect on the stands by moving them toward a more resilient condition that would allow fire to play a vital role in maintaining stand health, composition and structure." These are the kind of conclusory statements, based on "vague and uncertain analysis," that are insufficient to satisfy NEPA's requirements. *Ocean Advocates*, 402 F.3d at 869.

The EA also mentioned the possibility of cumulative effects in sections on other specific sub-topics such as fuels management, transportation resources, and

soil productivity. These sections similarly relied on conclusory assertions that the Project has "no cumulative effects." When the EA did acknowledge the possibility of the Project's impact, such as in the section that analyzed the Project's effects on spotted owls, it noted only that "[t]imber harvest on federal, tribal, and private land, and utility corridor operations have reduced the amount of suitable habitat . . . on the landscape and could continue to do so in the future," without attempting to quantify the cumulative loss or naming other projects. Yet there were other relevant timber projects to discuss. Appellants pointed out at least three other recent or future timber projects in their comments responding to the EA, but the relevant section of the document limited its analysis to only the Project area and a 1.2-mile buffer surrounding it. Such a small buffer zone fails to distinguish the EA's cumulative impact analysis from an analysis of the direct effects of the Project. *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d. at 997 (assessing cumulative effects at the critical habitat unit scale). The USFS's failure to engage with the other projects identified by Appellants leaves open the possibility that several small forest management actions will together result in a loss of suitable owl habitat. Preventing or adequately mitigating this potential loss is the fundamental purpose of NEPA's requirement that agencies analyze cumulative

impacts, and we have no basis in the record to assess whether the USFS has taken the necessary steps to consider this possibility.

Overall, there is nothing in the EA that could constitute "quantified or detailed information" about the cumulative effects of the Project. *Ocean Advocates*, 402 F.3d at 868 (internal quotation marks omitted). The USFS's analysis creates substantial questions about whether the action will have a cumulatively significant environmental impact. Therefore, this factor also requires the USFS to conduct an EIS. *See* 40 C.F.R. § 1508.27(b)(7).

3. Because an EIS is required, and because the findings in the EIS could prompt the USFS to change the scope of the Project or the methods it plans to use, we do not reach the Appellants' other claims. We reverse the district court's judgment and remand to the district court with instructions to remand to the USFS for the preparation of an EIS.

**REVERSED and REMANDED.**

Bark v. U.S. Forest Serv., No. 19-35665

GRABER, Circuit Judge, concurring:

I concur in full in the judgment and in all but section 2 of the majority's disposition. The project's proposed methodology of variable density thinning is both highly controversial and highly uncertain, so an environmental impact statement is required. I would not reach whether the Environmental Assessment's discussion of cumulative impacts also was arbitrary and capricious.